610 A.2d 286

**HARFORD COUNTY, Maryland**

v.

**HARFORD MUTUAL INSURANCE COMPANY et al.**

**No. 83, Sept. Term, 1991.**

Court of Appeals of Maryland.

Aug. 19, 1992.

Joseph D. Tydings (Jerold Oshinsky, Catherine J. Serafin, Anderson, Kill, Olick & Oshinsky, Washington, D.C., Emory Plitt, Jr., County Atty., Jefferson L. Blomquist, Asst. County Atty., Bel Air, on brief), for petitioner.

Charles Taylor, Gordon, Feinblatt, Rothman, Hoffberger, & Hollander, Baltimore, Jordan S. Stanzler, Anderson, Kill, Olick & Oshinsky, P.C., New York City, amicus curiae for Bausch & Lomb Inc.

Wilbur D. Preston, Jr. (William F. Ryan, Jr., Albert J. Mezzanote, Jr., Denise Y. Hansberry, Whiteford, Taylor & Preston, Baltimore, John R. Spielberger, Bel Air, on brief),

Roger E. Warin (Stephen A. Fennell, Robert R. Lawrence, Steptoe & Johnson, Washington, D.C., on brief), Dennis M. Flannery, Lynn Bregman, John J. Kim, Wilmer, Cutler & Pickering, Washington, D.C., on brief), for respondents.

Alan N. Gamse, David A. Carter, Christopher J. O'Donnell, Semmes, Bowen & Semmes, Baltimore, amicus curiae for Maryland Ass'n of Mut. Ins. Companies.

Timothy C. Russell, Michelle S. Katz, Sonnenschein, Nath & Rosenthal, Washington, D.C., amicus curiae for U.S. Fidelity and Guar. Co. and Maryland Cas. Co.

M. King Hill, III, Venable, Baetjer & Howard, Towson, John B. Wyss, Michael R. Cannon, Joseph L. Ruby, Wiley, Rein & Fielding, Washington, D.C., amicus curiae for Utica Mut. Ins. Co.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

We granted certiorari to address a single question presented by the petitioner, Harford County, Maryland: Whether, in the context of alleged environmental property damage, standard form comprehensive general liability insurance policies are "triggered for the policy periods when the damages take place, as opposed to the policy period when the damages are first discovered or 'manifested.' "

## I.

At various times between 1954 and 1982, Harford County operated five sanitary landfills, namely, Tollgate, Scarboro, Mullins, Bush Valley, and Abingdon. During part of this period, the County carried standard form comprehensive general liability (CGL) insurance with: (1) The Insurance Company of North America (INA) from 1958 to 1964; (2) Harford Mutual Insurance Company (Harford Mutual) from 1965 to 1980; and (3) The Home Insurance Company (Home) from 1980 to 1982. These policies covered, *inter alia,* the County's liability for property damage arising from the operation of one or more of these landfills for specified periods of time; each policy contained standard form language setting forth the insurer's contractual obligations to the County.

The INA policies provided that the insurer would pay on behalf of the insured, subject to other coverage terms not here pertinent,

"all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident."

These policies applied "only to accidents which occurred during the policy period."

As to Harford Mutual, its last four policies (from 1968 to 1980) provided that the insurer, subject to other policy terms not now in issue, would pay on behalf of the insured

"all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence." [1]

As to two of Harford Mutual's policies (between 1968 and 1974), "occurrence" is defined as

"an accident, including injurious exposure to conditions, which results, during the endorsement period in ... property damage neither expected nor intended from the standpoint of the insured."

As to Harford Mutual's policies between 1974 and 1980, "occurrence" is defined as

"an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured."

The definition of "occurrence" in the 1974 to 1980 policies did not contain the phrase "which results during the endorsement period"; however, the definition of "property damage" in the policies clearly indicates that this condition upon coverage is applicable. In this regard, "property damage" is defined in these policies as

"(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."

The Home policy, subject to other terms in the policy, covered all sums that the insured becomes "legally obligated" to pay because of "property damage" caused by an "occurrence." The words "property damage" and "occur-

---

**1.** Harford Mutual's 1965 to 1968 policy contained essentially the same language except that the word "accident" was used rather than the word "occurrence."

rence" are defined in terms identical to those used in the 1974 to 1980 Harford Mutual policies.

## II.

After the last of these policies had expired in 1982, Harford County discovered that pollutants from one or more of its landfills had seeped into and contaminated the underlying groundwater. It did not, however, notify any of the insurance companies until August 8, 1990; on that day, it sued each insurer in the Circuit Court for Harford County, seeking a declaratory judgment that the County was entitled to coverage under each policy for property damage claims arising out of the operation of the landfills.

The County averred in its complaint that in 1984 it undertook a preliminary environmental assessment of the Tollgate landfill, after which it approved a plan to install monitoring wells and analyze groundwater samples at this site. The complaint further averred that the County then prepared a remedial investigation plan which it submitted in 1986 to the Maryland Department of Health and Mental Hygiene; and that in 1988, in the course of designing a "cap" for the Tollgate facility, it "discovered off-site migration of certain gases posing a potential health hazard." It was also alleged that the area around the Tollgate facility was being developed as a residential area; that in 1990 a developer who owned a subdivision adjacent to Tollgate threatened to sue the County for damages "because of migration of contaminants from the landfill site onto the subdivision"; that purchasers of townhouses within adjacent subdivisions also were considering filing suit against the County; that in 1990 the County employed an environmental consultant to assess alternatives for the protection of the adjacent subdivisions; that the State of Maryland was "considering seeking a consent order against the County regarding alleged off-site migration of contaminants at this site"; and that the County has avoided judicial action by agreeing to clean up off-site contamination and, to this end, developed "a remedial action program to prevent any

alleged off-site property damage." The complaint further alleged that a gas extraction and a water treatment system had been designed for Tollgate "to begin remediation of the alleged off-site contamination," at an expenditure in excess of $1,500,000, with the ultimate cost of remediation being estimated at $2,000,000.

As to the Scarboro landfill, the complaint averred that in 1982 the County installed monitoring wells at this site and that thereafter the State tested the quality of the water taken from the monitoring wells; that in 1984 the County decided to close this site and did so by 1987 when it capped the landfill "by placing a geosynthetic membrane liner over the top, grading the sides, and providing for storm water sediment erosion control." The complaint specified that in 1986 the Maryland Department of the Environment notified the County that contaminants had been detected at the monitoring wells around the Scarboro site; and that the State advised the County of complaints which it had received "of possible off-site groundwater contamination" allegedly emanating from this site. It was further stated in the complaint that in 1986 the State advised the County that leachate from the Scarboro landfill may have caused off-site contamination of the drinking water supply of a nearby resident; that the resident sued the County for damages but that the suit was settled when the County purchased the property; that in 1987 other suits were filed against the County by neighboring residents, some of which alleged that the landfill was being operated as a hazardous waste disposal facility in violation of both state and federal law; that another suit against the County also alleged violations of state and federal law and claimed damages for nuisance, negligence, trespass, strict liability, and fraudulent concealment; that these cases were either dismissed or were settled by the County; and that in 1989 the Scarboro site was placed on a federal list of landfills being evaluated for clean up and other remedial purposes. It was additionally averred that the County entered into negotiations with the Maryland Department of the Environment and that, in an

effort to avoid placement of the site on the federal list of facilities mandated for "clean-up," it agreed to undertake a remedial program, the cost of which already exceeded $500,-000 for litigation expenses, consulting fees, and settlement costs; and that the ultimate plan for hydrogeologic investigation and remediation of off-site contamination may exceed $750,000.

As to Bush Valley, the complaint alleged that the Federal Environmental Protection Agency, beginning in 1985, investigated this site for inclusion on its list of landfills targeted for remediation activities; and that the County had been directed to perform and finance such an investigation and feasibility study. The County stated in its complaint that it would undertake these measures for which it estimated costs to it between $1,500,000 and $2,000,000. As to the Mullins and Abingdon sites, similar, but less specific, allegations were made concerning directives to the County to remediate the contamination at these sites.

Finally, the County alleged that, as the owner and operator of the landfills, it was under a "legal obligation to pay for steps to contain any off-site pollutants and to protect third-parties from harm"; that it has been forced to pay for investigative and remedial steps and has incurred, and will incur, expenses; that the alleged environmental impairments constitute "property damage" within the contemplation of the insurance policies; that these impairments occurred, or could have occurred, during the time period when the policies were in effect; that the insurers, therefore, have a duty to indemnify the County for all sums which it has incurred to date in connection with its remedial actions, including costs for cleaning up its own landfills, and to pay present and future expenses associated with controlling, preventing, and cleaning up any off-site contamination in the landfills. It also sought a declaration that the insurance companies were legally obligated to provide a defense to the County "in the pending underlying actions or threatened actions involving the landfills, and to pay the County's defense costs."

The case was subsequently transferred to the Circuit Court for Baltimore County after which, on December 20, 1990, Harford Mutual filed a motion for summary judgment. It set forth multiple reasons why there was no coverage for any of the claimed property damages, nor any obligation on its part to provide the County with a defense. Specifically, it maintained, *inter alia,* that (1) the policies provided coverage only for property damage to a third party; that they do not provide coverage for the costs of cleaning up contamination on the County's own property; (2) the policies provided coverage only for property damage to a third party, which is caused by an "accident"; that contamination resulting from the dumping of waste material at a waste landfill does not, it said, result from an accidental or fortuitous event; (3) the policies provided coverage only for those sums which the County is "legally obligated" to pay as "damages" to compensate for "property damage" sustained by a third party; that the insurer maintained that costs of cleaning up or closing the County's waste landfills are not legal "damages" or "property damage" within the ambit of the insurance policy coverage, but rather are the economic consequences of complying with the environmental laws; and (4) the policies obligated the insurer only to defend "suits"; and that no suits were pending against the County in connection with the various landfills. An additional ground asserted by Harford Mutual for granting summary judgment was that its CGL policies provided coverage only for property damage to a third person, which occurred during the policy period. It maintained that the alleged contamination first became known years after the expiration of its last policy and, since there was no evidence that any third party sustained any property damage during the time that its policies were in effect, there was no coverage. As to this ground for summary judgment, Harford Mutual relied upon *Mraz v. Canadian Universal Ins. Co., Ltd.,* 804 F.2d 1325 (4th Cir.1986), which purported to apply Maryland law, and *Harford Mut. Ins. Co. v. Jacobson,* 73 Md.App. 670, 536 A.2d 120 (1988).

These cases, Harford Mutual contended, held that there is no coverage under a standard form comprehensive general liability policy until the property damage is discovered or manifested during the policy period.

INA and Home filed similar motions for summary judgment, relying on the same grounds asserted in Harford Mutual's motion for summary judgment.

On February 20, 1991, Harford County filed a motion for partial summary judgment, supported by an affidavit of the Assistant County Attorney attesting to the truth of the allegations in the complaint. The County claimed that there was no genuine dispute as to any material fact and that it was entitled to judgment as a matter of law. It did not support its motion with an affidavit, depositions, or other evidentiary material to establish the time that the alleged property damage occurred at the various landfills. It nevertheless asserted that the insurance companies had a duty to pay the County's defense costs and any liability imposed on it as a result of the alleged environmental pollution at its landfills. It claimed that the environmental clean-up costs constituted "property damage" within the coverage of the policies. The County also acknowledged in its motion that it was not until the summer of 1990, after it had obtained additional counsel to represent it, that it "learned that Harford County's insurance applied to environmental claims."

The circuit court (Fader, J.) granted the summary judgment motions of the insurance companies on the sole ground that no coverage existed under the policies because, under the law espoused in *Mraz* and *Jacobson,* the alleged damages were not discovered or manifested until after the expiration of all of the policies. In so holding, the court, in a memorandum opinion, assumed, without deciding, that the County's declaratory judgment complaint "sufficiently alleged ... that Harford County would produce evidence at trial that contamination of the landfills, with toxic wastes, was continuous over a period of many years and over the policy periods of coverage afforded by the [insurance com-

panies]." Acting upon that assumed premise, the court said that "damage" within the coverage of the policies did not occur at any of the landfills before 1985 when it was first discovered or manifested itself. In this regard, Judge Fader applied the general rule set forth in *Jacobson,* namely, that the time of occurrence of an accident within the meaning of an indemnity policy is not the time that the wrongful action was committed but the time when the complaining party was actually damaged, *i.e.,* when the property damage first manifested itself. 73 Md.App. at 681, 536 A.2d 120. In support of the general rule, *Jacobson* cited *United States Fidelity & Guaranty Co. v. American Ins. Co.,* 169 Ind.App. 1, 345 N.E.2d 267, 270 (1976), and a number of state and federal cases collected in *Jacobson,* [73 Md.App.] n. 5, at 681, 536 A.2d 120. In addition, Judge Fader noted that *Mraz* reached the same conclusion. Deeming himself bound by the holding of these cases, Judge Fader determined that the trigger of coverage under the terms of CGL policies is based on "damage," *i.e.,* when the property damage first manifested itself. Accordingly, the court found that "none of the damage/harm/injury here manifested itself until 1985, two years following the expiration of the last policy issued by any of the Defendants." Summarizing, Judge Fader concluded that "it is the first manifestation of injury which is the equivalent of 'damage', which is the key to coverage." Having so ruled, Judge Fader nevertheless found it "incongruous to say that a Plaintiff may be able to prove that toxic waste contamination in fact occurred during an applicable policy period but no coverage is had because the injury/damage/harm first manifested itself ... subsequent to the policy period." Apparently believing that the policy language may be ambiguous, Judge Fader permitted the County to make a lengthy proffer at the time of the summary judgment proceeding of matters relating to trade usage and the drafting history of the policies. The proffer, according to Judge Fader, was intended by the County to support its position that the word "occurrence," for coverage purposes,

encompassed leakage of toxic wastes resulting in environmental contamination during the policy period. Having said this, Judge Fader explained that the proffer was not received in or as evidence, that the holding in *Jacobson* was dispositive, and that the court would "not look beyond that holding."

## IV.

In urging reversal of the circuit court's summary judgment, Harford County says that "groundwater contamination from the landfills began, or is alleged to have begun, shortly after the landfills became operational and continued over a period of years, including the time that the Insurance Companies' policies were in effect." The County maintains that in latent damage cases, as here, there is a temporal separation between the act which causes damage, the fact of damage, and the discovery or manifestation of that damage. It, therefore, urges that coverage under the CGL policies in question is "triggered" when property damage results from the happening of an "accident" or an "occurrence" during the policy period for which the insured is legally obligated to pay. "Property damage," it points out, is broadly defined in the policies, *inter alia*, as "physical injury to or destruction of tangible property." As to when environmental property damage results from leakage of contaminants from a landfill, the County asserts that this may be established through the testimony of experts in the science of hydrogeology without regard to when the damage is actually discovered. According to the County, most courts have rejected the "manifestation" theory of coverage applied in *Jacobson* and *Mraz* and have adopted a continuous trigger of coverage in cases involving liability for long-term environmental damage. In particular, the County relies upon *Broderick Inv. Co. v. Hartford Acc. and Indem. Co.*, 742 F.Supp. 571 (D.Col.1989); *New Castle County v. Continental Cas. Co. (CNA)*, 725 F.Supp. 800 (D.Del. 1989), *aff'd in part and rev'd in part*, 933 F.2d 1162 (3rd Cir.1991); and *Fireman's Fund Ins. Companies v. Ex–*

*Cell–O Corp.*, 662 F.Supp. 71 (E.D.Mich.S.D.1987); these cases tend to support the County's view that continuous leakage of pollutants from its landfills causes property damage and triggers coverage as to each CGL policy in effect at the time that the damage occurred.[2]

The County further contends that our recent decision in *Mitchell v. Maryland Casualty Co.*, 324 Md. 44, 595 A.2d 469 (1991), involving asbestos-related bodily injury, constitutes authority for its argument that the continuous trigger of coverage is the correct trigger in environmental property damage cases. *Mitchell* involved a CGL policy containing standard form language similar to that in the policies now before us. There, the policy insured a contractor who installed asbestos-containing products against liability because of, *inter alia*, bodily injury caused by an occurrence during the policy period. Long after the CGL policy had expired, the insured was sued by a number of individuals who sought personal injury damages allegedly arising from exposure to and consequent injury from Mitchell's asbestos products during the policy periods. The insurer claimed it

---

**2.** Other reported cases upon which the County relies for this proposition are *Federal Ins. Co. v. Susquehanna Broadcasting*, 727 F.Supp. 169 (M.D.Pa.1989), *aff'd*, 928 F.2d 1131 (3rd Cir.1991); *Moffat v. Metropolitan Cas. Ins. Co. of New York*, 238 F.Supp. 165 (M.D.Pa.1964); *City of Myrtle Point v. Pacific Indem. Co.*, 233 F.Supp. 193 (D.Ore.1963); *Gottlieb v. Newark Ins. Co.*, 238 N.J.Super. 531, 570 A.2d 443 (A.D. 1990); and *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wash.2d 869, 784 P.2d 507 (1990). *See also Continental Ins. v. N.E. Pharm. & Chem. Co.*, 811 F.2d 1180 (8th Cir.1987), *rev'd on other grounds en banc*, 842 F.2d 977 (1988); *Liberty Mut. Ins. Co. v. Triangle Industries, Inc.*, 765 F.Supp. 881 (N.D.W.Va.1991); *Time Oil Co. v. Cigna Property & Cas. Ins. Co.*, 743 F.Supp. 1400 (W.D.Wash.1990); *U.S. Fidelity and Guar. Co. v. Thomas Solvent Co.*, 683 F.Supp. 1139 (W.D.Mich.1988); *Montrose Chemical Corp. v. Admiral Ins. Co.*, 3 Cal.App.4th 1511, 5 Cal. Rptr.2d 358 * (1992); *Singsaas v. Diederich*, 307 Minn. 153, 238 N.W.2d 878 (1976); *Deodato v. Hartford Insurance Co.*, 143 N.J.Super. 396, 363 A.2d 361 (1976). In addition, the County has supplied the court with copies of a number of unreported cases in various state and federal courts, which also appear to support its position on the trigger of coverage issue. *See*, however, Maryland Rule 8–114.

* Editor's Note: Review Granted, May 21, 1992. See Cal.Rules of Court, Rule 976.

was not under a duty either to defend or to indemnify its insured because the alleged bodily injuries which gave rise to the suits against Mitchell were not discovered until after termination of the policy.

In declining to apply the "manifestation" theory as the sole trigger of coverage in *Mitchell*, we noted that the record contained expert medical evidence that a person who inhaled and retained asbestos fibers suffered "bodily injury" at the time of inhalation within the ambit of the policy's coverage. We there said:

> "[W]e align ourselves with the overwhelming weight of authority in the country and conclude that 'bodily injury' occurs when asbestos is inhaled and retained in the lungs.... On the record developed in this case, we conclude that, at a minimum, coverage under the policy to provide a defense and indemnification of the insured is triggered upon exposure to the insured's asbestos products during the policy period by a person who suffers bodily injury as a result of that exposure. Accordingly, we hold that the trial judge erred in adopting, as the *sole* trigger of coverage, the 'manifestation' theory of coverage, namely, that coverage is not afforded until harm actually becomes manifest."

324 Md. at 62, 595 A.2d 469 (emphasis in text).

The County maintains that our trigger analysis in *Mitchell* is applicable in the present case, likening it to claims involving continuous environmental property damage caused by seepage of contaminants from landfills. Based upon *Mitchell*, the County concludes that we must reverse the summary judgment and hold that the policies were continuously triggered in each period during which damage took place and not only when the damage was discovered or became manifest. The County emphasizes that the continuous coverage trigger which it here advocates in environmental pollution cases exactly parallels that adopted by us for asbestos-related bodily injury claims in *Mitchell*, as to which we cited numerous cases as constituting the majority rule in the country. *See* 324 Md. at 58–61, 595 A.2d 469.

The County characterizes the adoption of the "manifestation" trigger of coverage in *Jacobson* as dicta, contending also that the case was in any event inapposite on its facts.[3] As to the Fourth Circuit's decision in *Mraz*, the County maintains that it was wrongly decided, is contrary to the weight of authority, and is not in accordance with the law of Maryland.

In support of Judge Fader's decision, and his reliance upon *Jacobson* and *Mraz*, the insurance companies contend that these cases represent the majority view in the country, namely, that property damage must actually manifest itself during the policy period for coverage to be triggered under a CGL insurance policy. The insurers say that none of their policies was triggered because the alleged contamination did not, as Harford County concedes, manifest itself until after all the policies had expired.

Unlike *Jacobson, Mraz* was an environmental contamination case which squarely presented the trigger of coverage issue under the provision of a standard form CGL policy. The facts in *Mraz* were these: In 1969, chemical wastes from a solvent recycling plant were buried in metal drums at a nearby site. In 1981, it was discovered that leakage of the hazardous substances from the buried drums had contaminated the soil and groundwater. The plant owners, insured under a CGL policy between 1969 and 1970, sued the insurer, claiming that the insurer had a duty to defend and indemnify it for the property damage caused by the leakage. The policy required that the insurer pay all sums which its insured became "legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence," the word "occur-

---

3. *Jacobson* involved a claim for personal injuries resulting from lead poisoning in an apartment owned by a landlord insured under a CGL policy. The policy became effective nine months after the plaintiff had been diagnosed with the disease. The Court of Special Appeals held that no coverage existed because the injury resulting from the alleged negligent acts of the landlord was first discovered before the policy became effective.

rence" being defined in terms identical to that in the 1968 to 1974 Harford Mutual policies.

The court said that "a release [of hazardous substances] that results in property damage is not an occurrence within the meaning of the policy unless it results in damage during the policy period." *Mraz*, 804 F.2d at 1327. Referring to what it termed the "general rule," the court held that the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged. *Id.* at 1328. The court further observed:

"Often, these cases involve a wrongful act that produces no harm for a period of time and then suddenly manifests itself in a burst of damage.

\*      \*      \*      \*      \*      \*

"There are situations ... in which the existence or scope of damage remains concealed or uncertain for a period of time even though damage is occurring. The leakage of hazardous wastes as in this case is a clear example. Determining exactly when damage begins can be difficult, if not impossible. In such cases we believe that the better rule is that the occurrence is deemed to take place when the injuries first manifest themselves."

*Id.* (citations omitted). Upon this foundation, the court held "that in hazardous waste burial cases such as this one, the occurrence is judged by the time at which the leakage and damage are first discovered." *Id.*

In addition to *Mraz* and *Jacobson*, the insurance companies place reliance upon other cases which they claim have adopted "manifestation" or "discovery" as the sole trigger of coverage in property damage cases under standard form CGL policies. *See, e.g., Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56 (3rd Cir.1982); *Peerless Ins. Co. v. Strother*, 765 F.Supp. 866 (E.D.N.C.1990); *Detrex Chemical Industries v. Employers Ins.*, 746 F.Supp. 1310 (N.D.Ohio 1990); *Triangle Publications v. Liberty Mut.*

*Ins. Co.,* 703 F.Supp. 367 (E.D.Pa.1989); *Com. Fed. S. & L. v. Hartford St. Boiler Insp. & Ins.,* 580 F.Supp. 1170 (E.D.Mo.1984); *Honeycomb Systems, Inc. v. Admiral Ins. Co.,* 567 F.Supp. 1400 (D.Me.1983); *Aetna Casualty & Surety Co. v. PPG Industries, Inc.,* 554 F.Supp. 290 (D.Ariz.1983); *American Motorists Ins. Co. v. Trane Co.,* 544 F.Supp. 669 (W.D.Wis.1982), *aff'd,* 718 F.2d 842 (7th Cir.1983); *Bartholomew v. Insurance Co. of N. America,* 502 F.Supp. 246 (D.R.I.1980), *aff'd sub. nom., Bartholomew v. Appalachian Ins. Co.,* 655 F.2d 27 (1st Cir.1981); *Remmer v. Glens Falls Indem. Co.,* 140 Cal.App.2d 84, 295 P.2d 19 (1956); *Wrecking Corp. of Am. v. Insurance Co. of N.A.,* 574 A.2d 1348 (D.C.App.1990); *Travelers Ins. Co. v. C.J. Gayfer's & Co.,* 366 So.2d 1199 (Fla.App.1979); *Millers Mut. Fire Ins., Etc. v. Ed Bailey,* 103 Idaho 377, 647 P.2d 1249 (1982); *Transamerica Ins. v. Safeco Ins.,* 189 Mich. App. 55, 472 N.W.2d 5 (1991); *West American Ins. v. Tufco Flooring,* 104 N.C.App. 312, 409 S.E.2d 692 (1991).[4]

According to the insurers, the manifestation trigger of coverage is the appropriate rule in environmental property damage cases because until there is a decrease in the value of the property, property damage has not occurred. In this regard, the companies argue that there could be no property damage within the contemplation of the policies before the contamination is discovered. In other words, the insurers maintain that injury to property connotes only an economic loss or impairment of use or value, of which none could exist until the damage is known or becomes apparent.

The insurers also contend that nothing in our *Mitchell* decision requires us to hold that a continuous, rather than a manifestation, trigger of coverage is mandated for environmental property damage claims under the policies here involved. They assert that unlike the asbestos-related bodi-

---

4. The insurers, as did Harford County, *supra,* n. 2, have supplied the Court with copies of a number of unreported cases in various state and federal courts, which appear to support their position on the trigger of coverage issue.

ly injuries in *Mitchell,* where expert medical evidence was adduced that the injury to lung tissues occurred immediately upon inhalation and retention of asbestos fibers, the contaminating wastes emanating from the landfills did not result in immediate property damage but only if and when the market value of the affected property decreases upon discovery or manifestation. Thus, the insurers say that *Mitchell* addressed different policy language and qualitatively different underlying claims than that now before us.

## V.

Having taken into account all arguments presented by the parties, we begin our analysis where we started this opinion—with the language of the policies. In this connection, the primary principle of construction of any insurance policy is to apply the terms of the insurance contract. *Mitchell, supra,* 324 Md. at 56, 595 A.2d 469. In other words, an insurance contract, like any other contract, is measured by its terms unless a statute, a regulation, or public policy is violated thereby. *Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 388, 488 A.2d 486 (1985). It, therefore, bears repeating that the CGL policies now before us require the insurer to pay all sums which the insured shall become legally obligated to pay as damages because of, *inter alia,* "property damage" caused by an "occurrence" during the policy period. The Harford Mutual and Home policies define an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results [during the policy period] in ... property damage ... neither expected nor intended from the standpoint of the insured." From these provisions, it is clear that coverage turns on the happening of an "occurrence" during the policy period, which results in "property damage," a term defined in the policies either as "injury to or destruction of property" (as in INA), or "physical injury to or destruction of tangible property ..., including the loss of use thereof ..., or ... of tangible property which has not been physically injured or destroyed" (as in Harford Mutual

and Home). Nothing in the language of the policies, affording words their ordinary and accepted meanings, requires that the claimed property damage actually be discovered or manifested during the policy period; rather, it is whether property damage, as defined in the policies, "occurred" within the policy period and within the meaning of the word "occurrence" in the policies.

■ Plainly, the policies in question are "occurrence" type policies as distinguished from "claims made" policies. *See Mut. Fire, Marine & Inland Ins. v. Vollmer*, 306 Md. 243, 252–55, 508 A.2d 130 (1986). As we observed in that case, occurrence policies cover liability inducing events occurring during the policy term, irrespective of when an actual claim is presented. *Id.* at 252, 508 A.2d 130.[5] As to the use of "occurrence" policies, we further observed in *Vollmer*, 306 Md. at 255, 508 A.2d 130, that in the area of environmental contamination it is nearly impossible to identify the time of the tortious "occurrence" and the effect of long-term exposure upon the character of the injury, citing *Stine v. Continental Casualty Co.*, 419 Mich. 89, 349 N.W.2d 127 (1984). Similarly, in *Zuckerman v. National Union Fire Insurance Co.*, 100 N.J. 304, 312, 495 A.2d 395, 399 (1985), which we referred to in *Vollmer*, the court observed that in the use of "occurrence" policies for perils that can cause latent damage, as in environmental litigation, there is a difficulty in determining precisely when the essential causal event occurred.

■ Notwithstanding the difficulty that may be encountered in determining exactly when contaminants from a landfill may cause property damage, we hold that "manifestation" is not the sole trigger of coverage in environmental pollution cases. Rather, we conclude that coverage under the policies may be triggered during the policy period at a time earlier than the discovery or manifestation of the

---

5. A "claims made" or "discovery" policy covers liability inducing events if and when a claim is made during the policy term, irrespective of when the events occurred. *Id.* at 252, 508 A.2d 130.

damage. Indeed, as the court said in *Montrose Chemical Corp. v. Admiral Ins. Co.*, 3 Cal.App.4th 1511, 1528, 5 Cal.Rptr.2d 358 (1992) "[t]o read an occurrence policy to afford coverage only when the injury or damage becomes manifest during the policy period ... unfairly transforms the more expensive occurrence policy into a cheaper claims made policy."

The burden to show that property damage occurred within the coverage of the policies is, of course, upon the insured.[6] Whether at any time during the policy period the discharge of contaminants into the soil and underlying groundwater is of sufficient gravity to prove detectable "property damage" within the policies' definition of that term is quite likely a matter for expert testimony. We decide nothing more in this case than that Judge Fader was in error in limiting the trigger of coverage to the time of manifestation or discovery of the property damage. It is for this reason, and no other, that we shall vacate the summary judgment in the insurers' favor and remand the matter for further proceedings.

In this connection, we especially note that both the County and the insurers raised issues and advanced arguments beyond the single question presented in the certiorari petition. The insurers raised numerous defenses by way of policy exclusions and coverage limitations not considered or decided by the lower court but upon which they seek favorable rulings as separate grounds for affirming the summary judgment in the event we concluded that the *Mraz–Jacobson* line of cases should not be followed. Harford County asserted its version of the course of dealings with the insurance companies, insurance industry custom and trade usage with respect to the standard form policies

---

6. The insurer must defend its insured if it appears from the suit or other sources available at the time defense is tendered that there is a potential of liability under the policy. *See Mitchell, supra*, 324 Md. at 62, n. 4, 595 A.2d 469; *Continental Casualty v. Board of Educ.*, 302 Md. 516, 528, 489 A.2d 536 (1985); *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842 (1975).

at issue and the drafting history of the policies—all in an effort to show that the policies are "triggered by damage that takes place during consecutive policy periods." We have scrupulously avoided expressing any opinion on the merits of any of these matters.

SUMMARY JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID, ONE-THIRD EACH, BY THE RESPONDENT INSURANCE COMPANIES.