667 A.2d 617

D. Paul SULLINS et al.

v.

ALLSTATE INSURANCE COMPANY.

Misc. No. 7, Sept. Term, 1995.

Court of Appeals of Maryland.

Nov. 6, 1995.

Reconsideration Denied Dec. 19, 1995.

**504**

Howard J. Schulman (Schulman & Kaufman, LLC, on brief), Baltimore, for Appellants.

Julie C. Janofsky (Ward, Janofsky & Truhe, P.A., on brief), Towson, for Appellee.

Joseph D. Tydings (Anderson Kill Olick & Oshinsky, P.C., on brief), Washington, DC, for amici curiae, The Center for Children and Families Inc., The Fresh Air Fund, and Delmarva Power & Light Company; Irene C. Warshauer, Joan L. Lewis, and Andrea J. Pincus, of counsel (Anderson Kill Olick & Oshinsky, P.C., on brief), New York City, Richard E. Poole (Potter Anderson & Corroon, on brief), Wilmington, DE.

Hyacinth Kucik, Senior Counsel, amici curiae, Federal Home Loan Mortgage Corporation, McLean, VA (Howard S. Lindenberg, amici curiae, Federal Home Loan Mortgage Corporation, of counsel and on brief), McLean, VA.

Laura A. Foggan, Daniel E. Troy, Jonathan M. Shaw, Mary E. Borja Wiley, Rein & Fielding, Washington, DC, for amici

curiae Insurance Environmental Litigation Association and National Association of Independent Insurers.

Linda S. Woolf, Goodell, DeVries, Leech & Gray, Baltimore, for amicus curiae, The Property Owners Association of Greater Baltimore, Inc.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

This case comes to us from the United States District Court for the District of Maryland pursuant to the Maryland Uniform Certification of Questions of Law Act, Maryland Code (1974, 1995 Repl.Vol.) §§ 12–601—12–609 of the Courts and Judicial Proceedings Article. The question of state law certified for our determination is:

> Whether an insurance company has a duty to defend and/or indemnify its insured in an action alleging injury from exposure to lead paint where the insurance policy excludes coverage for:
>
> > bodily injury which results in any manner from the discharge, dispersal, release, or escape of:
> >
> > a) vapors, fumes, acids, toxic chemicals, toxic liquids or toxic gasses;
> >
> > b) waste materials or other irritants, contaminants or pollutants.

## I

The certified facts disclose that on September 14, 1990, the Allstate Insurance Company (Allstate) issued a Deluxe Homeowners Policy to Reverend D. Paul Sullins and Patricia H. Sullins (Sullinses). Under the heading "Losses We Do Not Cover," the policy contained the following exclusion:

> We do not cover bodily injury or property damage which results in any manner from the discharge, dispersal, release, or escape of:

a) vapors, fumes, acids, toxic chemicals, toxic liquids or toxic gasses;

b) waste materials or other irritants, contaminants or pollutants.

On November 15, 1990, Allstate issued an endorsement to the policy adding liability coverage to the Sullinses' rental properties, including the property located at 30 South Fulton Avenue in Baltimore.

In July, 1993, Esther Ames, a tenant residing in the Sullinses' rental property and mother of Deonta Ames, filed a complaint against the Sullinses in the Circuit Court for Baltimore City; the complaint alleged that Deonta Ames, her infant child, sustained injuries from ingesting lead paint at the 30 South Fulton Avenue property. The Sixth Count of the Complaint alleges:

3. ... the Defendant ... allowed said paint [containing lead pigment] to chip and flake thereby rendering the dwelling unsafe. ...

4. ... the infant ingested and consumed paint containing lead and lead pigment. ...

5. That the injuries, illness and infirmities of the infant Plaintiff were due to:

a) The violation by the Defendant of ... City Code ... requiring every dwelling ... to be fit for human habitation and of the Rules ... prohibiting the use of paint for interior painting of any dwelling unit unless such paint is free from any lead pigment. ...

d) ... in failing to undertake suitable means to eradicate the aforesaid danger caused by the flaked condition of the paint. ...

7. That as a result thereof and of the ingestion and consumption by the infant Plaintiff, of the paint in the dwelling, the infant Plaintiff contracted and was caused to suffer lead poisoning.

Allstate thereafter filed a complaint in the United States District Court for the District of Maryland alleging:

Plaintiffs in the *Ames* suit allege that due to the dispersal or release of toxic lead paint particles at the 30 S. Fulton Avenue property, Plaintiff Deonta Ames contracted lead poisoning. . . .

Because the facts alleged in the Complaint in the *Ames* suit establish indisputably that the alleged injury to Deonta Ames fell within an express exclusion in the policy, Allstate, as a matter of law, has no duty to provide a further defense to the Sullinses in the *Ames* suit, or to indemnify them for any judgment, settlement or other costs in that case.

## II

 In Maryland, insurance policies, like other contracts, are construed as a whole to determine the parties' intentions. *Cheney v. Bell National Life,* 315 Md. 761, 766–67, 556 A.2d 1135 (1989). Words are given their "customary, ordinary, and accepted meaning," unless there is an indication that the parties intended to use the words in a technical sense. *Id., see also Chantel Associates v. Mt. Vernon,* 338 Md. 131, 142, 656 A.2d 779 (1995). "A word's ordinary signification is tested by what meaning a reasonably prudent layperson would attach to the term." *Bausch & Lomb v. Utica Mutual,* 330 Md. 758, 779, 625 A.2d 1021 (1993). If the language in an insurance policy suggests more than one meaning to a reasonably prudent layperson, it is ambiguous. *Collier v. MD–Individual Practice,* 327 Md. 1, 607 A.2d 537 (1992); *Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 488 A.2d 486 (1985). A term which is clear in one context may be ambiguous in another. *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 74, 517 A.2d 730 (1986); *Bentz v. Mutual Fire,* 83 Md.App. 524, 537, 575 A.2d 795 (1990).

 Where terms are ambiguous, extrinsic and parol evidence may be considered to ascertain the intentions of the parties. *Cheney, supra,* 315 Md. at 766–67, 556 A.2d 1135. "Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer." *Id.* Nevertheless, "if no extrinsic or

parol evidence is introduced, or if the ambiguity remains after consideration of the extrinsic or parol evidence that is introduced, it will be construed against the insurer as the drafter of the instrument." *Id.; see also, e.g., Collier, supra,* 327 Md. at 5–6, 607 A.2d 537; *Mut. Fire, Marine & Inland Ins. v. Vollmer,* 306 Md. 243, 251, 508 A.2d 130 (1986); *St. Paul Fire & Mar. Ins. v. Pryseski,* 292 Md. 187, 193–96, 438 A.2d 282 (1981); *Truck Ins. Exch. v. Marks Rentals,* 288 Md. 428, 435, 418 A.2d 1187 (1980); *Aragona v. St. Paul Fire & Mar. Ins.,* 281 Md. 371, 375, 378 A.2d 1346 (1977).

Our cases hold that an insurer has a duty to defend its insured if there is a potentiality that the claim may be covered by the policy; that obligation is ordinarily determined by the allegations in the underlying tort action. If the plaintiff in the tort suit alleges a claim covered by the policy, the insurer has a duty to defend where the potentiality exists that the claim could be covered by the policy. In this regard, to determine whether there is a potentiality of coverage, we look to the policy, the complaint, and extrinsic evidence, if any is adduced. *See Aetna v. Cochran,* 337 Md. 98, 108, 651 A.2d 859 (1995); *Chantel Associates, supra,* 338 Md. at 141, 656 A.2d 779; *Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 407–08, 347 A.2d 842 (1975).

### III

The terms in the exclusion,[1] "contaminants" and "pollutants," are susceptible of two interpretations by a reasonably prudent layperson. By one interpretation, these terms encompass lead paint; by another interpretation, they apply only to cases of environmental pollution or contamination, and not to products such as lead paint. Since no extrinsic evidence appears in the record at this time to clarify the intentions of the parties in using these terms, the policy must be construed

---

1. The exclusion at issue here is commonly known as a "pollution exclusion."

against Allstate as the drafter of the policy. *Cheney, supra,* 315 Md. at 766–67, 556 A.2d 1135.

■ While lead is clearly "toxic," a reasonably prudent layperson may not view lead as a "chemical." Webster's Dictionary defines "chemical" as "a substance (as an acid, alkali, salt, synthetic organic compound) obtained by a chemical process, prepared for use in chemical manufacture, or used for producing a chemical effect." *Webster's Third New International Dictionary* 384 (1981) [hereinafter *"Webster's "*].

■ Similarly, a reasonably prudent layperson may not generally think of lead as an "irritant." Webster's Dictionary defines "irritant" as "something that irritates or excites" and "irritated" as "roughened, reddened, or inflamed." *Webster's, supra,* at 1197. There is nothing before us to indicate that lead "irritates" or that it is generally considered an "irritant." *Cf. A–1 Sandblasting & Steamcleaning Co. v. Baiden,* 53 Or.App. 890, 632 P.2d 1377 (1981), *aff'd,* 293 Or. 17, 643 P.2d 1260 (1982) (paint in common understanding is not generally thought of as an irritant). *Contra, St. Leger v. American Fire and Cas. Ins. Co.,* 870 F.Supp. 641 (E.D.Pa.1994).

A reasonably prudent layperson may, however, consider lead to be a "contaminant." Webster's Dictionary defines "contaminant" as "something that contaminates" and "contaminate" as "to soil, stain, corrupt, or infect by contact or association" or "make inferior or impure by mixture." *Webster's, supra,* at 291. Thus, the term "contaminant" may encompass lead. *See, e.g., U.S. Liab. Ins. Co. v. Bourbeau,* 49 F.3d 786, 788 (1st Cir.1995); *St. Leger, supra,* 870 F.Supp. at 643.

Similarly, a reasonably prudent layperson may consider lead to be a "pollutant." Webster's Dictionary defines "pollutant" as "something that pollutes" and "pollute" as "to make physically impure or unclean." *Webster's, supra,* at 1756. The term "pollutant" may reasonably include lead paint. *See, e.g., U.S. Liab. Ins. Co., supra,* 49 F.3d 786; *St. Leger, supra,* 870 F.Supp. 641.

A reasonably prudent layperson may also interpret the terms "contaminant" and "pollutant" as *not* including lead paint. The Supreme Judicial Court of Massachusetts affirmed a lower court's holding that the term "pollutant," was ambiguous as applied to a lead paint poisoning claim. The court said:

> We conclude that an insured could reasonably have understood the provision at issue to exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence. There simply is no language in the exclusion provision from which to infer that the provision was drafted with a view toward limiting liability for lead paint-related injury. The definition of "pollutant" in the policy does not indicate that leaded materials fall within its scope. Rather, the terms used in the pollution exclusion, such as "discharge," "dispersal," "release," and "escape," are terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste.

*Atlantic Mut. Ins. Co. v. McFadden,* 413 Mass. 90, 595 N.E.2d 762, 764 (1992) [hereinafter *"McFadden"*]. In *U.S. Liab. Ins. Co., supra,* 49 F.3d 786, the court held that lead paint is unambiguously a "pollutant" where the paint, stripped from the outside of a building, contaminates the surrounding soil. Distinguishing *McFadden,* the court said:

> Most importantly, *McFadden* was not an environmental pollution case. *McFadden* concerned personal injury caused by the *presence* of lead in a household. This case concerns injury to property caused by the alleged negligent *discharge* of lead paint onto property. The latter is a classic example of "pollution"—the discharging of a harmful substance onto land—while the former is most demonstrably not. An objectively reasonable person simply would not ascribe the word "pollution" to the presence of lead paint in a house.

*Id.* at 789; *accord General Acc. Ins. Co. of America v. Idbar,* 163 Misc.2d 809, 622 N.Y.S.2d 417, 419 (Sup.Ct.1994); *Genera-*

*li–U.S. Branch v. Caribe Realty,* 160 Misc.2d 1056, 612 N.Y.S.2d 296 (Sup.Ct.1994). Some courts have held that products, despite their toxic nature, are not "pollutants" or "contaminants" when used intentionally and legally. The North Carolina Court of Appeals held that styrene resin used to resurface a floor was not a pollutant, but "a raw material used . . . in [the] normal business activity of resurfacing floors." *West American Ins. v. Tufco Flooring,* 104 N.C.App. 312, 409 S.E.2d 692, 698 (1991), *review denied,* 332 N.C. 479, 420 S.E.2d 826 (1992); *cf. Hydro Systems, Inc. v. Continental Ins. Co.,* 717 F.Supp. 700 (C.D.Cal.1989), *aff'd,* 929 F.2d 472 (9th Cir.1991) (styrene discharged into atmosphere a "pollutant" within the pollution exclusion; not a "product" within "products-completed operations hazard" exception to the pollution exclusion). Similarly, a federal district court held that 88% formic acid used to determine whether a carpet was suitable for dyeing was not a pollutant. *Regent Ins. Co. v. Holmes,* 835 F.Supp. 579, 582 (D.Kan.1993); *see also Karroll v. Atomergic Chemetals Corp.,* 194 A.D.2d 715, 600 N.Y.S.2d 101 (App.Div.1993) (pollution exclusion clause does not apply to action by bulldozer operator accidentally sprayed with sulfuric acid); *cf. Sargent Constr. Co. v. State Auto Ins. Co.,* 23 F.3d 1324 (8th Cir.1994) (meaning of "pollutant" ambiguous with regard to muriatic acid used to prepare a concrete floor); *Demakos v. Travelers Ins. Co.,* 205 A.D.2d 731, 613 N.Y.S.2d 709 (1994) (cigarette smoke which allegedly seeped into tenant's premises from pool and billiard club in basement was a "pollutant").

The court in *Pipefitters Welfare Educ. Fund v. Westchester Fire,* 976 F.2d 1037 (7th Cir.1992), said that:

> The terms "irritant" and "contaminant," when viewed in isolation, are virtually boundless, for "there is virtually no substance or chemical in existence that would not irritate or damage some person or property." Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results. Take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who

slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants and contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.

*Id.* (pollution exclusion bars coverage for tort suit alleging discharge of 80 gallons of oil containing polychlorinated biphenyls). *But see Crabtree v. Hayes–Dockside, Inc.*, 612 So.2d 249 (La.Ct.App.1992) (polyvinyl chloride dust, a plastic powder used to make pipes, leaked from bagging process into atmosphere causing personal and property injuries was an "irritant or contaminant" because it caused irritation and product label warned of possible irritation). Therefore, just as a reasonably prudent layperson might not consider Drano to be a "pollutant" or "contaminant," so might a reasonably prudent layperson not consider lead paint to be a "pollutant" or "contaminant."

The history of the pollution exclusion supports this conclusion. Before 1966, standard general comprehensive liability policies covered damages "caused by accident." Because the courts' interpretations of this language were varied and overly broad, the insurance industry, in 1966, changed the language to "occurrence," defined as "an accident, including continuous or repeated exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *See Bernhardt v. Hartford Fire Ins.*, 102 Md.App. 45, 51, 648 A.2d 1047 (1994). Again, the courts interpreted the language broadly, mandating coverage even for intentional discharges of pollutants in the course of ongoing business operations. *Id.*

The Supreme Court of New Jersey in *Morton Int'l, Inc. v. General Accident Ins. Co.*, 134 N.J. 1, 629 A.2d 831, 850 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994), said:

Foreseeing an impending increase in claims for environmentally-related losses, and cognizant of the broadened

coverage for pollution damage provided by the occurrence-based, CGL policy, the insurance industry drafting organizations began in 1970 the process of drafting and securing regulatory approval for the standard ["sudden and accidental"] pollution-exclusion clause.

*Id.* The court continued:

"The insurer's primary concern was that the occurrence-based policies, drafted before large scale industrial pollution attracted wide public attention, seemed tailor-made to extend coverage to most pollution situations." Commentators attribute the insurance industry's increased concern about pollution claims to environmental catastrophes that occurred during the 1960s.... Other commentators observe that the insurance industry, concerned about public reaction to environmental pollution, desired to clarify and publicize its position that CGL policies did not indemnify knowing polluters.

*Id.; see also* Joshua E. Rosenkranz, Note, *The Pollution Exclusion Clause Though the Looking Glass,* 74 Geo.L.J. 1237, 1251 n. 73 (1986). The "sudden and accidental" pollution exclusion clause denied coverage for:

bodily injury arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gasses, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release, or escape is sudden and accidental; ....

*Bernhardt, supra,* 102 Md.App. at 51–52, 648 A.2d 1047. The exclusion was intended to eliminate coverage for damages from pollution of the environment. *Molton, Allen & Williams, Inc. v. St. Paul F. & M. Ins.,* 347 So.2d 95, 99 (Ala.1977); *Thompson v. Temple,* 580 So.2d 1133, 1134 (La.Ct. App.1991); *Continental Cas. v. Rapid–American,* 80 N.Y.2d 640, 593 N.Y.S.2d 966, 609 N.E.2d 506, 512 (1993).

Once again, courts' interpretations of the language varied and, in 1985, the industry adopted the "absolute pollution

exclusion" which denied coverage for "bodily injury or proper-
ty damage arising out of the actual, alleged or threatened
discharge, release, or escape of pollutants" and defined "pollu-
tant" as "any solid, liquid, gaseous or thermal irritant or
contaminant including smoke, vapor, soot, fumes, acids, alka-
lies, chemicals and waste." *Bernhardt, supra,* 102 Md.App. at
49, 52, 648 A.2d 1047. Since the terms "discharge, dispersal,
release, or escape" are environmental terms of art, the "into
or upon land, the atmosphere or any watercourse or body of
water" language in the former exclusion was merely redun-
dant. Thus, there is "no indication that the change in the
language was meant to expand the scope of the clause to non-
environmental damage." *West American, supra,* 409 S.E.2d
at 699.

That the industry's intention was to exclude only environ-
mental pollution damage from coverage is further evidenced
by the use of the words "discharge," "dispersal," "release,"
"escape," "contaminant," and "pollutant." These are terms of
art in environmental law, *Essex Ins. Co. v. Avondale Mills,
Inc.,* 639 So.2d 1339, 1341 (Ala.1994); *McFadden, supra,* 595
N.E.2d 762; *Continental Cas., supra,* 593 N.Y.S.2d at 973, 609
N.E.2d at 513; *West American, supra,* 409 S.E.2d at 699, and
are used by Maryland courts to refer to environmental expo-
sure. *Am. Motorists Ins. Co. v. ARTRA Group, Inc.,* 338 Md.
560, 659 A.2d 1295 (1995) ("discharge" and "release" of toxic
and hazardous chemicals into soil and groundwater); *Bausch
& Lomb, supra,* 330 Md. at 764, 766, 771, 625 A.2d 1021
("pollution" used to describe groundwater contamination);
*Harford County v. Harford Mut. Ins.,* 327 Md. 418, 426, 436,
610 A.2d 286 (1992) ("pollution" used to describe groundwater
contamination; "discharge of contaminants into the soil");
*WSSC v. CAE–Link Corp.,* 330 Md. 115, 134 n. 10, 135, 622
A.2d 745 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 288, 126
L.Ed.2d 238 (1993) ("discharges into the Potomac River"); *see
also, e.g.,* Maryland Environment Code (1982, 1993 Repl.Vol.,
1995 Supp.) §§ 2-101(b), 4-101.1, 4-401, 5-101, 7-201.

It appears from the foregoing discussion that the insurance
industry intended the pollution exclusion to apply only to

environmental pollution. That supports our conclusion that a reasonably prudent layperson may interpret the terms "pollution" and "contamination," in the circumstances of the case now before us, as *not* encompassing lead paint, a product used legally and intentionally. Since the terms "pollution" and "contamination" suggest more than one meaning to a reasonably prudent layperson, they are ambiguous and must be construed against Allstate, the drafter of the policy. *E.g., Collier, supra,* 327 Md. 1, 607 A.2d 537.

The federal district court's holding in *St. Leger, supra,* 870 F.Supp. 641, that lead paint is unambiguously a "pollutant" within the pollution exclusion, conflicts with both *McFadden* and our holding here. The court in *St. Leger* relied on an unpublished opinion and federal statutes, neither of which is persuasive under Maryland law in determining the meaning of terms to a reasonably prudent layperson. Nevertheless, the conflict in judicial opinions regarding whether lead paint is a "pollutant" under the pollution exclusion remains.[2]

---

**2.** Many other cases holding that the pollution exclusion is unambiguous appear to conflict with our holding. Most of those cases, however, involve environmental exposure. *E.g., U.S. Liab. Ins. Co., supra,* 49 F.3d 786 (lead paint stripped from the outside of a building contaminated surrounding soil); *Pipefitters, supra,* 976 F.2d 1037 (discharge of polychlorinated biphenyls onto land); *American States Ins. Co. v. F.H.S., Inc.,* 843 F.Supp. 187 (S.D.Miss.1994) (leak of ammonia from warehouse refrigeration system into surrounding area); *Hydro Systems, supra,* 717 F.Supp. 700 (styrene discharged into atmosphere); *Alcolac Inc. v. California Union Ins. Co.,* 716 F.Supp. 1546 (D.Md.1989) (contamination of environment from release of toxic chemicals); *Guilford Industries Inc. v. Liberty Mut. Ins. Co.,* 688 F.Supp. 792 (D.Me.1988), *aff'd,* 879 F.2d 853 (1st Cir.1989) (rupture of oil tanks during a flood caused oil to flow downstream); *Perkins Hardwood Lumber v. Bituminous Cas.,* 190 Ga.App. 231, 378 S.E.2d 407 (1989) (wood-fire smoke discharged into atmosphere); *Crescent Oil Co. v. Federated Mut. Ins.,* 20 Kan.App.2d 428, 888 P.2d 869 (1995) (gasoline leaked into ground from underground storage tanks); *Crabtree, supra,* 612 So.2d 249 (polyvinyl chloride dust leaked into atmosphere); *U.S. Bronze v. Commerce & Ind.,* 259 N.J.Super 109, 611 A.2d 667 (1992) (discharge of copper sulfate into the soil and atmosphere); *Budofsky v. Hartford Ins. Co.,* 147 Misc.2d 691, 556 N.Y.S.2d 438 (1990) (heavy metals and hazardous substances in cesspool system of metal-products electroplating business); *cf. Bentz, supra,* 83 Md.App. 524, 575 A.2d 795 (spraying of toxic

Some courts hold that the existence of conflicting judicial interpretations of insurance policy terms is evidence of ambiguity, while others hold such conflict is not conclusive. *See generally* Charles C. Marvel, Anno., 4 A.L.R.4th 1253 (1981); *compare Little v. MGIC Indem. Corp.,* 836 F.2d 789, 796 (3d Cir.1987); *Aetna Cas. & Sur. Co. v. DeBruicker,* 838 F.Supp. 215, 221, *aff'd,* 30 F.3d 1484 (3d Cir.1994) (E.D.Pa.1993); *Schmohl v. Travelers' Ins. Co.,* 177 S.W. 1108, 1111 (Mo.App. 1915), *rev'd on other grounds,* 266 Mo. 580, 182 S.W. 740 (1916) *and Cohen v. Erie Indem. Co.,* 288 Pa.Super. 445, 432 A.2d 596, 599 (1981) *with Lower Paxton Tp. v. U.S. Fid. and Guar. Co.,* 383 Pa.Super. 558, 557 A.2d 393, 400 n. 4 (1989); *Nationwide Mut. Ins. Co. v. Wenger,* 222 Va. 263, 278 S.E.2d 874, 877 (1981); *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 355–56, 385 N.E.2d 1280, 1283 (1978) *and Trinity Universal Ins. Co. v. Robert P. Stapp, Inc.,* 278 Ala. 209, 177 So.2d 102, 105 (1963).

The court in *Cohen* reasoned that where several appellate courts, construing the same policy language, denied coverage and several others granted coverage, the conflict in judicial opinion "itself creates the inescapable conclusion that the provision in issue is susceptible to more than one [reasonable] interpretation." *Cohen, supra,* 432 A.2d at 599. The New York Court of Appeals noted, however, that "It is ... for this Court to say, as a matter of law, whether reasonable men may reasonably differ...." *Breed, supra,* 413 N.Y.S.2d at 356, 385 N.E.2d at 1283 (quoting *Hartigan v. Casualty Co. of Amer.,* 227 N.Y. 175, 124 N.E. 789, 790 (1919)).

> Surely we would be abdicating our judicial role were we to decide such cases by the purely mechanical process of searching the nation's courts to ascertain if there are conflicting decisions. The law of Pennsylvania is that we must find an ambiguity only where the policy is *reasonably* susceptible of differing interpretations. Thus, whether other courts have reached varying conclusions regarding the

---

pesticides fell within pollution exclusion, but was "sudden and accidental" within exception to pollution exclusion).

meaning of a policy is only relevant where the various meanings ascribed are reasonable.

*Lower Paxton Tp., supra,* 557 A.2d at 400 n. 4; *see also Fireman's Fund Ins. Companies v. Ex–Cell–O Corp.,* 702 F.Supp. 1317, 1323 n. 7 (E.D.Mich.1988) ("Conflicting judicial interpretations may indeed be some evidence of ambiguity. But if the policies are unambiguous, conflicting judicial interpretations do not prevent [the court] from so finding.")

■ We hold that conflicting interpretations of policy language in judicial opinions is not determinative of, but is a factor to be considered in determining the existence of ambiguity. In interpreting an insurance policy, we must follow the rules of contract construction set out in part II of this opinion. However, if other judges have held alternative interpretations of the same language to be reasonable, that certainly lends some credence to the proposition that the language is ambiguous and must be resolved against the drafter.

■ We find that the pollution exclusion clause does not remove Allstate's duty to defend the Sullinses in the underlying lead paint poisoning action.[3] As to the duty to indemnify, we find that if liability is established at the trial in the District Court, the pollution exclusion, of itself, on the present state of the record, would not insulate the insurer from indemnifying its insured.

*QUESTION OF LAW ANSWERED AS HEREIN SET FORTH; COSTS TO BE EQUALLY DIVIDED*

---

3. To be sure that lead paint poisoning claims were excluded from coverage, Allstate could have included a provision, such as those included in the policies at issue in *Chantel, supra,* 338 Md. at 137 n. 5, 656 A.2d 779, and *J.A.M. v. Western World,* 95 Md.App. 695, 698, 622 A.2d 818 (1993), explicitly excluding such claims.