SCOTTSDALE INSURANCE COMPANY

v.

AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY.

Civ. No. JFM–91–1422.

United States District Court,
D. Maryland.

Jan. 25, 1993.

Denise Stanley, Allen Johnson, Alexander & Karp, Baltimore, MD, for plaintiff.

Kathleen M. McDonald, Irwin, Kerr, Green, McDonald & Dexter, Baltimore, MD, for defendant.

OPINION

MOTZ, District Judge.

In this action Scottsdale Insurance Company ("Scottsdale") seeks indemnification or contribution from American Empire Surplus Lines Insurance Company ("American Empire") for a settlement which Scottsdale paid and defense costs which it incurred in connection with a lead paint exposure suit filed against their mutual insured, Richard A. Shepherds, t/a Shepherd's Properties.

On February 11, 1992, I issued an opinion addressing four of the issues raised by the parties. In that opinion I indicated that "lying at the heart of the case is the difficult question of the application of the policy term 'occurrence' in the lead paint context." I deferred ruling upon that question until the record had been developed on

issues of medical causation. That record has now been established, and Scottsdale has moved for summary judgment.

## I.

Candace Anthony was born on January 17, 1983. From birth until June 6, 1985, she lived at Homestead Avenue in Baltimore. On the latter date she moved to 2534 Garrett Avenue, which was owned and managed by Richard Shepherd. American Empire insured the premises from June 6, 1985 until October 8, 1985, and Scottsdale insured the premises from October 8, 1985 until October 8, 1986. Candace and her mother moved out of the Garrett Avenue house in July 1986.

On December 6, 1986, Mrs. Anthony, individually and as Candace's mother, filed a complaint in the Circuit Court for Baltimore City. She alleged that Candace sustained lead poisoning as the result of ingesting lead paint both at the Homestead Avenue and the Garrett Avenue properties. The suit was settled on the eve of trial for $190,000. Scottsdale contributed $152,500 and GEICO contributed $37,500 to the settlement. American Empire, after having been notified of the proposed settlement, refused to make any contribution. I have previously ruled that the amount of the settlement and of Scottsdale's contribution to it were reasonable.

The medical facts are undisputed. On May 6, 1985, a month before the Anthonys moved to Garrett Avenue, a Free Erythrocyte Protoporphyrin (FEP) test was administered to Candace. The test demonstrated that Candace had ingested lead and had elevated lead levels. On October 22, 1985, while Candace was living at Garrett Avenue and approximately two weeks after American Empire's policy covering the premises had expired, another FEP test was performed. That test revealed that Candace had a blood level of 37 micrograms per deciliter which placed her into a category characterized as "Moderate Risk, Class II." On June 10, 1986, a third test showed that Candace's blood level had increased to 53 micrograms per deciliter. Three weeks later she was admitted to the Kennedy Institute for Handicapped Children for treatment of Class III Plumbism.

Candace was treated by Dr. J. Julian Chisolm, a world-renowned expert in the field of lead poisoning in children. Dr. Chisolm has testified that it is his "opinion within a reasonable degree of medical probability that Candace Anthony sustained lead poisoning while a resident of 2534 Garrett Avenue and that such poisoning was sustained on a continuing basis during her residence there from June 1985 to June 1986 and that she sustained permanent brain damage as a result of such poisoning."[1]

Dr. Chisolm's opinion, which has not been contradicted in any way by American Empire, is based upon his examinations of Candace, his review of her medical records and his general knowledge of the disease process. As explained by Dr. Chisolm, although a single isolated ingestion of lead "probably [is] not going to make a difference," a young child's continuous exposure to lead will (by interfering with the transmission of nerve impulses and with the functions of calcium in the brain) stunt the growth of the brain. Although not instantly measurable, adverse physiological effects occur "very quickly" after continuous

---

1. This phrasing of Dr. Chisolm's opinion is contained in an affidavit which he has submitted in support of Scottsdale's summary judgment motion. However, Dr. Chisolm had previously been deposed and the opinion which he has expressed in his affidavit is substantially the same as that which he expressed on deposition. There he was asked the following question and gave the following answer:

   Q. And is it your opinion to a reasonable degree of medical certainty or can you give me an opinion to a reasonable degree of medical certainty whether at least some of that

damage was sustained between June of 1985 and October of 1986?
Ms. McDonald: Objection to form.
A. I would say so on the basis that the FEP shows a doubling between May 6, 1985 and the next test, which was on 10–22–85. So somethings [sic] been going on during that interval.
Apparently agreeing that this testimony substantially parallels the opinion stated by Dr. Chisolm in his affidavit, American Empire did not request the opportunity to redepose him after he submitted the affidavit.

exposure and ultimately manifest themselves in learning disabilities and reduced I.Q. In Dr. Chisolm's view "the younger the child, the greater the suspectibility" to lead poisoning since the rate of growth of the brain is most rapid between about the sixth month of pregnancy and the first two and a half to three years of age. He further noted that a child is most likely to ingest lead paint between her first and third birthdays since that is the period during which her sucking reflex is strongest and her mobility to get out of the crib (and to get to places where lead is located) has become developed.

## II.

Under their policies with Shepherd, American Empire and Scottsdale each agreed to pay all sums for "bodily injury" caused by an "occurrence" for which the insured becomes liable. "Bodily injury" is defined in the policies as "bodily injury, sickness or disease sustained ... during the policy period." "Occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury ... neither expected nor intended from the standpoint of the insured ..." This language is standard in the insurance industry, and courts have frequently been called upon to construe it. Four cases applying Maryland law are particularly pertinent here.

The first of these cases, *Mraz v. Canadian Universal Insurance Co., Ltd.*, 804 F.2d 1325 (4th Cir.1986), was an environmental contamination case. It presented the issue of whether the release of hazardous substances that results in property damage is an occurrence for purposes of triggering coverage or whether coverage is triggered only when the leakage and damage is discovered. The plaintiff had been insured by the defendant when the hazardous waste first leaked, but the policy had expired when the leak was first discovered. Following what it called the general rule, the Fourth Circuit held that the "[t]he time of occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was

actually damaged." *Mraz*, 804 F.2d at 1328 (quoting *United States Fidelity & Guaranty Co. v. American Insurance Co.*, 169 Ind.App. 1, 345 N.E.2d 267, 270 (Ind.1976)). The court further noted that:

There are situations ... in which the existence or scope of damage remains concealed or uncertain for a period of time even though damage is occurring. The leakage of hazardous wastes as in this case is a clear example. Determining exactly when damage begins can be difficult, if not impossible. In such cases we believe that the better rule is that the occurrence is deemed to take place when the injuries first manifest themselves.

*Mraz*, 804 F.2d at 1328 (citations omitted). Thus, the court held that in hazardous waste burial cases, the first manifestation of injury or occurrence "is judged by the time at which the leakage and damage are first discovered." *Id.*

The next case which addressed this issue was *Harford Mutual Insurance Co. v. Jacobson*, 73 Md.App. 670, 536 A.2d 120 (1988). A tenant of Jacobson became afflicted with lead poisoning and sued Jacobson. Harford had insured the premises owned by Jacobson from June 3, 1983 to June 3, 1984. It initially undertook the defense of the case. However, upon learning that the plaintiff was afflicted with lead poisoning as early as September 1982 and that the child's mother had signed city health records indicating lead poisoning in the child in November 1982 and January 1983 (all before Harford insured the premises), Harford concluded that "coverage was not available under the policy because the occurrence alleged in the [child's] suit did not arise during the policy period." *Jacobson*, 536 A.2d at 122.

The policy in question (like the policies in the present case) stated: "[f]or the purpose of determining the limit of the company's liability, all bodily injury or property damage arising out of continuous or repeated exposure to substantially the same general condition shall be considered as arising out of *one* occurrence." *Id.* at 125. Because the continuous exposure began prior to the beginning of its policy and such exposure is

defined in the policy as one occurrence, Harford argued that it was not liable for any part of the settlement. Jacobson argued that an "occurrence" and therefore coverage should be found as long as the occurrence, or even part of the occurrence, takes place during the policy period.

Relying on the *Mraz* decision and other cases dealing with the issue of occurrence, the court held that:

> We agree with those cases that the date of an "occurrence" for purposes of determining coverage under an insurance policy is the date when the harm is first discovered. In the case *sub judice*, the insurance policy provided coverage only for an occurrence which gave rise to bodily harm *during the period*. [The child] was first exposed to leaded paint in 1981. Unquestionably, the injurious effects of that exposure persisted into the period of coverage. But her injuries first manifested themselves *prior* to coverage when she was diagnosed in 1982 by the Baltimore City Health Department as having lead poisoning.

*Jacobson*, 536 A.2d at 127. Thus, the *Jacobson* court, like the Fourth Circuit in *Mraz*, adopted the "manifestation theory" for determining liability under the policies.

In *Mitchell v. Maryland Casualty Co.*, 324 Md. 44, 595 A.2d 469 (1991), the Court of Appeals analyzed the question of what event or events trigger insurance coverage in the context of asbestos-related personal injuries. In that case, Mitchell, a mechanical contractor involved in the sale, distribution and installation of products containing asbestos, had general liability insurance with Maryland Casualty from 1955 until 1977 or 1978. Subsequent to the expiration of its last policy, Mitchell was sued by a number of plaintiffs who alleged personal injury damages arising from exposure and injuries caused by Mitchell's asbestos products. Mitchell demanded that Maryland Casualty defend the suit. When Maryland Casualty refused to do so, a declaratory judgment action subsequently was brought to determine whether its policy applied. Based primarily on the holdings in *Jacobson* and *Mraz*, the trial court concluded

that an " 'occurrence' in the context of insurance coverage, is defined as the date when the harm is first discovered." 595 A.2d at 472.

The trial court therefore had not considered to be material medical evidence presented by Mitchell to demonstrate that a "bodily injury" within the meaning of the policy occurs when a person is exposed to asbestos. Specifically, Mitchell's expert had testified:

> [I]nhaled [asbestos] fibers which are not exhaled may enter one of several million air sacs in the lungs, provoking an irritation and inflammatory response by body cells known as alveolar macrophages and leukocytes. The result of the bodily process which attempts to protect against the foreign object, namely the asbestos fiber, is that there are injuries to the cells, tissues and bodily organs which occur within minutes after the inhalation of the asbestos fibers.... Despite the relatively immediate injury to the cells, tissues and organs of the body, there are significant latency periods (15 and more years) before conditions such as asbestosis, bronchogenic carcinoma, and mesothelioma manifest themselves and become diagnosable to a clinician.

*Id.* at 473.

On appeal the Court of Appeals found that the trial court's holding that the policy is triggered *"only* after the asbestos-related disease becomes manifest during the policy period is an interpretation at odds with the policy language and the clear weight of authority." *Id.* at 476. The Court noted that other courts examining this issue "have concluded that 'bodily injury' occurs when asbestos is inhaled into the lung, and that, *at a minimum*, coverage under the policy is triggered by exposure to the insured's asbestos products during the policy period." *Id.* (citations omitted). Likewise, the Court noted that the standard insurance policies do not "expressly require[ ] that the injury be diagnosed or identified within that period, or that the injury manifest itself or progress to sickness or disease during the policy period." *Id.* (citations omitted). However, the

court went on to say that "[o]f course, it is implicit that *mere* exposure to asbestos, without injury, does not trigger coverage. In this vein, however, the cases recognize from the medical evidence that inhalation of asbestos fibers starts the injurious chain of events which may culminate in an asbestos-related disease." *Id.* (citations omitted).

Thus, the court held that "the trial judge erred in adopting, as the *sole* trigger of coverage, the 'manifestation' theory of coverage ... [A]t a minimum, coverage under the policy is triggered upon exposure to and inhalation of asbestos fibers during the policy period by a person who suffers bodily injury as a result of that exposure." *Id.* at 478. The court further stated that the trial court's reliance on *Mraz* and *Jacobson* "does not support its rejection of the exposure theory of coverage" because they did not involve the interpretation of a standard insurance policy in the context of asbestos related claims. *Id.* The court specifically expressed "no view as to the correctness of either of [those] decisions in the context of the subject matter involved." *Id.* at 478 n. 5.

Most recently, in *Harford County v. Harford Mutual Insurance Co.*, 327 Md. 418, 610 A.2d 286 (1992), the Court of Appeals addressed whether the exposure or manifestation trigger theory of coverage should apply in the context of alleged environmental property damage. In that case, various insurance companies had insured consecutively a number of sanitary landfills operated by Harford County. These policies applied only to accidents that occurred during the policy period. After the policies expired, numerous suits were brought against the County concerning pollutants from one or more of the formerly insured landfills that had seeped into and contaminated the underlying drinking water. The insurance companies refused to defend, asserting among other grounds, that the policies were not applicable because the property damage occurred after the policies had expired.

*Mitchell* had not yet been decided, and the trial court granted the insurers' motion for summary judgment "on the sole ground that no coverage existed under the policies because, under the law espoused in *Mraz* and *Jacobson*, the alleged damages were not discovered or manifested until after expiration of all of the policies." 610 A.2d at 290. On appeal, the County urged reversal based on the basis of other courts' rejection of the manifestation theory and adoption of a "continuous trigger of coverage in cases involving liability for long-term environmental damage." *Id.* at 291 (citations omitted). Further, the County argued that the court's decision in *Mitchell*, which by that time had been rendered, supported its contention that a continuous trigger of coverage should be adopted in environmental property damage cases.

The insurance companies argued that the trial court's decision should be affirmed because the manifestation theory announced in *Mraz* and *Jacobson* is the "general rule." Further, the insurers argued that manifestation is the proper trigger because property values do not decrease or become injured until the environmental accident is discovered and thus there is no injury akin to the physical injury identified in *Mitchell*.

The court began its analysis by looking at the language of the policies. Specifically, the court noted that "property damage" was defined in the policy as either

"injury to or destruction of property" ..., or "physical injury to or destruction of tangible property ...', including the loss of use thereof ..., or ... of tangible property which has not been physically injured or destroyed".... Nothing in the language of the policies, affording words their ordinary and accepted meanings, requires that the claimed property damage actually be discovered ʿor manifested during the policy period; rather, it is whether property damage, as defined in the policies, "occurred" within the policy period and within the meaning of the word "occurrence" in the policies.

*Id.* at 294.

Turning to the question of when property damage has occurred under the policy, the court held that:

Notwithstanding the difficulty that may be encountered in determining exactly when contaminants from a landfill may cause property damage, we hold that "manifestation" is not the sole trigger of coverage in environmental pollution cases. Rather, we conclude that coverage under the policies may be triggered during the policy period at a time earlier than the discovery or manifestation of the damage. Indeed, as the court said in *Montrose Chemical Corp. v. Admiral Ins. Co.*, 3 Cal.App.4th 1511, 1528, 5 Cal. Rptr.2d 358 (1992) "[t]o read an occurrence policy to afford coverage only when the injury or damages becomes manifest during the policy period ... unfairly transforms the more expensive occurrence policy into a cheaper claims made policy."

*Harford County*, 610 A.2d at 294–95. The court further noted that the "burden to show property damage occurred within the coverage of the policies is, of course, upon the insured." *Id.* at 294 (footnote omitted). With respect to the question of what degree of "discharge of contaminants into the soil and underlying groundwater is of sufficient gravity to prove detectable 'property damage' within the policies' definition," the court stated that definition of that term "is quite likely a matter for expert testimony." *Id.*

### III.

■ I have described these cases at some length because, although the Court of Appeals has not specifically addressed the "trigger" question in the lead poisoning context, it is clear to me that the transition from *Mraz* to *Harford County* demonstrates that exposure plus bodily injury (even if unmanifested) is now sufficient under Maryland law to trigger coverage.

American Empire virtually concedes as much. Although it suggests that the question should perhaps be certified to the Court of Appeals, the main focus of its argument is that Scottsdale has failed, as required by *Mitchell*, to demonstrate that Candace suffered bodily injury during American Empire's policy period.[2] Specifically, American Empire contends that Candace did not suffer bodily injury at Garrett Avenue because she had already sustained lead poisoning while living at Homestead Avenue.

■ This contention is wholly without merit. Perhaps there may be a case where a child's exposure to lead poisoning at one location has been so extensive for such a long period of time that a subsequent exposure at another location has no effect upon her medical condition. Any such finding would, however, have to be based upon supporting evidence, and there is no such evidence here. To the contrary, Dr. Chisolm has testified unequivocally and without contradiction that Candace sustained brain damage from lead poisoning throughout her residency at Garrett Avenue. The tests administered to Candace fully support his opinion. Although the first test conducted on May 6, 1985, a month before the Anthonys moved to Garrett Avenue, did show that Candace had elevated lead levels, the second test administered on October 22, 1985, approximately two weeks after American Empire's policy had expired, showed that there had been a doubling of the level of lead in her blood. The third test conducted in June 1986 demonstrated that Candace's condition continued to worsen, and three weeks later—after having lived at Garrett Avenue for thirteen months—she was admitted to the Kennedy Institute.

American Empire further contends that Scottsdale has not met the *Mitchell* test

---

**2.** In my judgment the question here presented is not worthy of certification to the Court of Appeals. Although the Court has discreetly refrained from expressly saying that the Fourth Circuit misinterpreted Maryland law in *Mraz*, it has made it clear that manifestation of injury is not the sole trigger of coverage. In any event, even if I were otherwise inclined to certify the question, I would not do so in light of the fact that this action was originally instituted in the

Circuit Court for Baltimore City and was removed by American Empire to this Court. Thus, if I were to certify the question, I would be permitting American Empire to bypass established appellate procedure under Maryland law, including depriving the Court of Appeals from deciding (by the exercise of its discretionary *certiorari* power) whether to entertain the question at all.

because Dr. Chisolm cannot pinpoint an exact day during American Empire's policy period when Candace ingested lead at Garrett Avenue. This contention is, at best, a quibble. It ignores Dr. Chisolm's testimony that throughout her stay at Garrett Avenue Candace sustained lead poisoning. Moreover, the evidence is undisputed that lead existed on the premises, that Candace was exposed to it and that the level of lead in her blood increased during American Empire's policy period. Thus, any assumption that Candace did not begin to ingest lead at Garrett Avenue until after Scottsdale had begun to insure the premises is merely fanciful.[3]

## IV.

There are two remaining issues which need to be briefly addressed: (1) is Scottsdale entitled to indemnification from American Empire or only for contribution, and (2) if the latter, in what amount?

■ In contending that it is entitled to indemnification, Scottsdale relies upon the "single occurrence" clause contained both in its own policy and American Empire's policy. It provides that "for the purpose of determining the limit of the company's liability, all bodily injuries arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." Scottsdale argues that because, according to Dr. Chisolm's undisputed testimony, the bodily injuries suffered by Candace Anthony arose out of continuous exposure to lead paint at the insured premises and because the entire course of exposure (which began during American Empire's policy period) is defined by both poli-

cies as one occurrence, American Empire is obligated to pay the entire claim. The error in this reasoning is that the purpose of the clause in question is not to apportion coverage between insurers providing coterminous coverage. Rather, it is to protect the issuing insurer from a claim that each instance of exposure constitutes a separate occurrence for which an independent claim up to the policy limits can be made.[4]

Thus, Scottsdale is entitled not to indemnification, but only to contribution, from American Empire. The amount of the contribution to which it is entitled presents a somewhat closer question. Scottsdale argues that American Empire's contribution should be 50% of the $152,500 which Scottsdale paid in settlement; American Empire contends that it should only pay ⁴/₁₃ths of that settlement since it insured the Garrett Avenue property for only four of the approximately thirteen months that the Anthonys lived there.

In support of its position Scottsdale relies upon *Ryder Truck Rental, Inc. v. Schapiro & Whitehouse, Inc.*, 259 Md. 354, 269 A.2d 826 (1970). In that case Schapiro & Whitehouse had been responsible for an accident in which a trailer which it owned and a tractor which it rented from Ryder were involved. The tractor and the trailer were covered by insurance policies issued by different companies. The limits of the two policies were in different amounts but each of them, absent the other, would have provided full coverage. Interpreting "other insurance" clauses contained in both policies, the Court of Appeals held that liability between the two insurers should be apportioned equally, not in a proportion based upon the respective amounts of their policy

---

**3.** If anything, the evidence would suggest that it is likely that Candace ingested more lead during American Empire's policy period than during Scottsdale's policy period. As indicated above, Dr. Chisolm testified that a child is most likely to ingest lead between her first and third birthdays. Candace became three on January 17, 1983 after having lived at Garrett Avenue five months during the time that American Empire had insured the premises and three months during the time that Scottsdale had insured the premises.

**4.** Scottsdale cites in passing language from *Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27, 29 (1st Cir.1981) (cited by the Maryland Court of Special Appeals in *Jacobson*, 536 A.2d at 126) stating that "the insurance is against an occurrence, not a reoccurrence ..." However true that proposition may be in the abstract, it is not applicable here in light of the uncontradicted testimony of Dr. Chisolm (upon which Scottsdale itself relies to trigger coverage under American Empire's policy) that Candace sustained lead poisoning throughout her stay at Garrett Avenue.

limits. In reaching this conclusion, the court relied upon the reasoning in an earlier New Jersey case, *Cosmopolitan Mutual Ins. Co. v. Continental Cas. Co.*, 28 N.J. 554, 147 A.2d 529 (1959), that the approach of apportioning shares based upon policy limits ignores the fact that "[i]t is commonly known that the cost of liability insurance does not increase proportionately with the policy limits ... [and that] the cost of increased limits is relatively small when compared to the cost of minimum coverage." 269 A.2d at 831.

In the present case both the American Empire and Scottsdale policies include a standard "other insurance" provision. In pertinent part that clause reads as follows:

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a) Contribution by Equal Shares. If all of such other valid and collectible insurance provides for contributions by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share ...

(b) Contribution by Limits. If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

The policy limits of the American Empire and Scottsdale policies are the same, and Scottsdale therefore argues that under both paragraph (a) and (b) of the quoted language, equal apportionment is required.

The flaw in Scottsdale's argument is that *Ryder* and the standard "other insurance" clause deal with the question of whether there should be equal contribution or contribution based upon policy limits. They do not address the question here presented: whether, where insurers' liability is based upon an exposure theory, there should be equal contribution or contribution based upon the respective lengths of exposure during the different policy periods. The first clause of the standard "other insurance" provision premises application of the provision to situations "when both this insurance and other insurance applied to the loss on the same basis." Thus, to rely upon the provision is to beg the underlying question of whether the different policies do apply "on the same basis" when the periods of exposure which they covered were of different lengths.

The only case which the parties have brought to my attention addressing this issue is *Export S.S. Corp. v. American Ins. Co.*, 106 F.2d 9, 12 (2d Cir.1939), *cert. denied*, 309 U.S. 686, 60 S.Ct. 809, 84 L.Ed. 1029 (1940). There, a cargo of tobacco had been damaged by exposure over a period of time to valonia, a kind of acorn used in tanning. Two different insurers had provided coverage during the period of exposure, and the court held that liability should be apportioned among them not in equal shares but on a proportion based upon the respective periods that they had provided coverage during the time which damage from exposure to the valonia had occurred.

I find the approach taken by the court in *Export S.S.* to be persuasive. While an equal apportionment rule would be easier to apply, it would be entirely inequitable in cases where one insurer had provided coverage during almost the entire period during which damage from exposure had occurred while another insurer had provided coverage only for a brief moment during that period. Therefore, I adopt the approach articulated in *Export S.S.*, and I find, in light of the uncontradicted testimony of Dr. Chisolm that Candace Anthony suffered damage from lead poisoning throughout her stay at Garrett Avenue, that American Empire's and Scottsdale's shares of liability are 4/13ths and 9/13ths,

respectively.[5]

A separate order effecting the rulings made in this opinion is being entered herewith.

### ORDER

For the reasons stated in the opinion entered herein, it is, this 25th day of January 1993

ORDERED

1. The motion for summary judgment filed by Scottsdale Insurance Company is granted; and

2. Judgment is entered in favor of Scottsdale against American Empire Surplus Lines Insurance Company in the amount of $46,923.00, plus interest.

---

**5.** I recognize that in light of Dr. Chisolm's testimony that children are most likely to ingest lead before their third birthdays, an argument might be made that American Empire's share of liability should be ⅝ths and Scottsdale's ⅜ths since Candace Anthony became three on January 17, 1983. *See* footnote 3, *supra.* However, Dr. Chisolm gave his testimony on this point only by way of general background and was never asked by Scottsdale to render a specific opinion (based upon his examination of Candace and his review of her medical records) as to whether she began to sustain less lead poisoning after her third birthday. To the contrary, his testimony is (as Scottsdale itself repeatedly asserts) that Candace sustained lead poisoning continuously throughout her stay at Garrett Avenue.