871 A.2d 599

**Rita Towana RILEY et al.**

v.

**UNITED SERVICES AUTOMOBILE ASSOCIATION.**

**No. 16, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

April 4, 2005.

Brian S. Brown (Saul E. Kerpelman & Associates, PA, on brief), Baltimore, for appellant.

Andrew Janquitto (Mudd, Harrison & Burch, on brief), Towson, for appellee.

Panel DAVIS, EYLER, JAMES R., KRAUSER, JJ.

DAVIS, J.

In the Circuit Court for Baltimore City, the Carpenter family [1] sued their former landlord, an Owings Mills dentist named Kenneth Hooper, alleging that Hooper negligently exposed the Carpenter children to lead paint during their tenancy and that, as a result, they suffered permanent brain damage. During discovery in that action, the parties disputed the applicability of Hooper's insurance policies for the premises, issued by United Services Automobile Association (USAA).

To resolve the insurance dispute, USAA, the appellee here, brought a declaratory judgment action against appellants, the Carpenters, and Hooper,[2] seeking to establish that USAA's maximum exposure in the underlying tort action is $300,000. Appellants initially contended that Hooper's USAA policies provided $2.7 million of coverage, but now contend they provide $1.2 million. The lead paint case was stayed pending resolution of the insurance case.

The circuit court granted appellee's motion for summary judgment, declaring that appellee's policies indemnify Hooper up to $600,000 of liability. From that judgment, appellants noted this appeal and presented the following question, which we have rephrased:

Did the circuit court err by making findings of fact when it granted summary judgment for appellee?

---

**1.** Rita Riley, and her children, Jeremy Carpenter, Christian Carpenter, and Wendy Carpenter, are referred to collectively as "the Carpenter family" or "the Carpenters."

**2.** Hooper is not a party to this appeal.

Appellee noted a cross-appeal and presented the following question, which we have also rephrased:

> Did the circuit court err in declaring that USAA's policies provided $600,000 of coverage, instead of $300,000?

We answer "yes" to the first question, and, accordingly, we shall reverse the judgment. To guide the parties on remand, we address the second question as well.

## FACTUAL BACKGROUND

Hooper purchased four consecutive homeowner's insurance policies from USAA to cover 1803 West Mosher Street, the property he rented to the Carpenters. The Carpenters lived at the premises during portions of each of the four insurance periods, which were:

- July 28, 1990 to July 28, 1991;
- July 28, 1991 to March 1, 1992;
- March 1, 1992 to March 1, 1993; and
- March 1, 1993 to March 1, 1994.

The family left the house sometime in the fall of 1993.

Counts 1 through 3 of the underlying complaint each sought $1 million dollars for damages resulting from injuries to Jeremy Carpenter, who was born shortly after the family's tenancy began.[3] Counts 4, 5, and 6 each sought $1 million dollars for damages resulting from the injuries to Wendy Carpenter, who was two years old when the family moved into the residence. Finally, counts 7, 8, and 9 each sought the same damages for injuries to Christian Carpenter, who was not yet one when the family moved in. The allegations in the complaint of lead ingestion were subsequently supported by a relative's affidavit, stating that the children were frequently

---

3. The record is clear that the family's tenancy comprised portions of each of the four insurance periods, but the record is unclear as to exactly when the family moved into the property. Appellants assert that the tenancy began in June 1989, while appellee asserts that the tenancy began in June 1990. The significance of the discrepancy is dealt with in section II of our legal analysis.

seen "gnawing on the windows and picking the paint" throughout the tenancy.

In the course of the litigation, the Carpenters submitted evidence of their blood-lead level histories. Blood-lead levels are usually measured in micrograms per deciliter of blood, abbreviated as "μg/dL." *See* Scott A. Smith, *Turning Lead into Asbestos and Tobacco: Litigation Alchemy Gone Wrong,* Defense Counsel Journal, Apr. 2004, at 123. As medical research has progressed, what experts consider to be a "safe" lead level has consistently dropped:

> Prior to 1970, the U.S. Surgeon General defined the "level of concern" of lead in a young child's blood as 60μg/dL, a level rarely seen today. In 1970, the Surgeon General reduced the level of concern to 40μg/dL. In 1978, the Centers for Disease Control and Prevention (CDC), having assumed jurisdiction over lead poisoning prevention from the Surgeon General, further reduced the level of concern to 30μg/dL; in 1985, to 25μg/dL; and in 1991, to 10μg/dL, where it stands today.

*Id.*

Only recently has research shown that lead levels below 10μg/dL not only are injurious, but, in fact, are disproportionately injurious, causing more harm per μg/dL up to 10 than beyond 10. Richard L. Canfield *et al., Intellectual Impairment in Children with Blood Lead Concentrations Below 10μg per Deciliter,* 348 New Eng. J. Med. 1517, 1521–25 (2003) (Canfield). Appellants submitted to us a copy of the Canfield article in a motion to supplement the record, but, because the results of the Canfield research had not yet been published when this case was before the trial court, it did not consider that research in rendering the challenged summary judgment decision, and therefore neither shall we. *See, e.g., Douglas v. First Sec. Fed. Sav. Bank,* 101 Md.App. 170, 176–78, 643 A.2d 920 (1994).[4]

---

**4.** Further, appellants' motion did not cite any authority authorizing us to consider the article. *See* Md. Rule 8–432(d) ("A motion ... shall

The Carpenter children's lead levels were not measured until the fourth insurance policy period. Their results were:

| Jeremy Carpenter | |
|---|---|
| Date | Lead Level |
| April 26, 1993 | 29µg/dL |
| September 8, 1993 | 32µg/dL |
| October 20, 1993 | 24 or 25µg/dL |
| December 15, 1993 | 18 or 19µg/dL |
| May 9, 1994 | 19µg/dL |
| February 17, 1995 | 12µg/dL |
| September 20, 1995 | 12µg/dL |
| December 19, 1995 | 11µg/dL |

| Wendy Carpenter | |
|---|---|
| Date | Lead Level |
| April 26, 1993 | 19µg/dL |
| September 13, 1993 | 23µg/dL |
| December 22, 1995 | 10µg/dL |

| Christian Carpenter | |
|---|---|
| Date | Lead Level |
| May 19, 1993 | 23µg/dL |
| June 17, 1993 | 24µg/dL |
| September 13, 1993 | 28µg/dL |
| May 9, 1994 | 15µg/dL |
| February 17, 1995 | 11µg/dL |
| May 15, 1995 | 11µg/dL |
| September 21, 1995 | 9µg/dL |

Thus, owing to the late date at which the children were tested, it remains unknown when the children's lead levels first exceeded 10µg/dL. In its summary judgment motion in the declaratory judgment action, appellee asserted that the Carpenters could not prove that any bodily injuries were

state with particularity the grounds and the authorities in support of each ground.").

sustained during the first and second policy periods (i.e., before March 1, 1992), because no evidence showed that their lead levels exceeded the level-of-concern threshold of the Center of Disease Control of 10μg/dL during that time.

From the lead-level tables above, it is apparent that the earliest of the children's blood tests occurred in April 1993, showing a level of 29μg/dL for Jeremy Carpenter, and 19μg/dL for Wendy Carpenter. The Carpenters' medical expert, Dr. Howard Klein, conceded in his deposition that, based solely on this data and then-current medical research, when projecting backwards in time before the children's lead tests, he could only conclude that the children's blood-lead levels exceeded 10μg/dL during the third and fourth insurance periods. Simultaneously, however, Dr. Klein averred in an affidavit:

It is my opinion within a reasonable degree of medical probability that Christian Carpenter and Wendy Carpenter were "exposed" to hazardous lead-based paint and dust at the premises 1803 W. Mosher Street beginning the date they first moved into the property in June 1989. Likewise it is my opinion within a reasonable degree of medical probability that Jeremy Carpenter was "exposed" to hazardous lead based paint and dust at the premises ... beginning [*in utero*] and continuing at his birth on February 24, 1990.... It is further my opinion within a reasonable degree of medical probability that this exposure for all three children caused damage on a cellular level to the children's brains, disrupting normal cellular development. These opinions are based on the deteriorated condition of the lead-based paint while the children resided at the property, evidence of hand to mouth activity, gnawing on leaded paint, as well as actual observation of ingestion of lead paint chips.... It is further my opinion within a reasonable degree of medical probability that the lead-based paint and dust exposure during each separate policy period, in and of itself caused immediate bodily harm and injury to the cells of the brain, central nervous system tissues and organs for each of the three Carpenter children.

In his deposition, Dr. Klein never reconciled this opinion with his concession that, at the time, no published research confirmed that lead paint was harmful at levels below 10μg/dL, and that he could not say when the children's lead levels exceeded 10μg/dL. In a subsequent affidavit, however, he essentially explained that the question was not asked of him during the depositions.

Arguing that Dr. Klein's opinion would be inadmissible at trial, appellee asserted that there was no evidence of injury in the first and second policy periods, so no recovery could possibly be had under those policies. The trial court agreed and entered partial summary judgment for appellee on that point.

As to the remaining policies, appellee asserted that, although the aggregate of the two policies' limits of liability was $600,000, because the children's injuries during the two policy periods constituted a single occurrence under the policies' terms, recovery could only be had under one policy, up to $300,000. Each of the policies are materially identical, and each of them provides, under "Coverage E":

> If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we [the insurer] will:
>
> 1. pay up to your limit of liability [i.e., $300,000] for the damages for which the insured is legally liable; and
>
> 2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent.

The policies define "occurrence" as:

> An accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in
>
> a. bodily injury; or
>
> b. property damage.

"Bodily injury" is then defined as "bodily harm, sickness or disease, including required care, loss of services and death that results," and finally, the policies impose a limit of liability:

Our total liability under Coverage E for all damages resulting from any one occurrence will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of insureds, claims made or persons injured. All bodily injury and property damage resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one occurrence.

The trial court rejected appellee's argument that, under these provisions, recovery could be had from only one policy. The court concluded that appellee's policies were ambiguous as to whether an insured may "stack" consecutive policies' coverage limits in cases of a continuous injury spanning more than one policy. Construing the ambiguity against the insurance company, the court declared that appellee was exposed to $600,000 liability in the underlying tort action.[5]

## LEGAL ANALYSIS

### I

Appellee moved for summary judgment under Maryland Rule 2–501, which provides, in relevant part:

(a) Any party may make a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. *The motion shall be supported by affidavit if it is ... based on facts not contained in the record.*

(b) A response to a written motion for summary judgment shall be in writing and shall (1) identify with particularity

---

**5.** The ambiguity was construed against appellee because appellee drafted the insurance agreement, not because it is an insurer. *E.g., Dutta v. State Farm Ins. Co.,* 363 Md. 540, 556–57, 769 A.2d 948 (2001).

each material fact as to which it is contended that there is a genuine dispute and (2) as to each such fact, identify and attach the relevant portion of the specific document, discovery response, transcript of testimony (by page and line), or other statement under oath that demonstrated the dispute. A response asserting the existence of a material fact or controverting any fact contained in the record shall be supported by an affidavit or other written statement under oath.

(c) An affidavit supporting or opposing a motion for summary judgment shall be made upon personal knowledge, shall set forth such facts *as would be admissible in evidence,* and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit.
* * *

(f) The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

(Emphasis added.)

The trial court's decision as to the first two policy periods simply reads:

As a factual matter, on the record before the Court, the three Carpenter Children cannot establish that any one of them suffered bodily injury within the meaning of the USAA policies during the terms of the first two policies. . . .

Therefore, as a factual matter, the maximum number of USAA policies implicated is two.

Appellee's theory on appeal is that the trial court appropriately disregarded Dr. Klein's opinion because it would have been inadmissible at trial under Maryland Rule 5–702, governing the admissibility of expert testimony. Thus, the refusal to admit Dr. Klein's opinion regarding injuries below $10\mu g/dL$ as part of the record, appellee argues, results in its entitlement to summary judgment as a matter of law because there no longer remained a genuine dispute as to whether the children

suffered "bodily injury," as defined in the policies, during the first two policy periods.

On this evidentiary issue, we will only disturb the trial court's decision if it amounts to an abuse of discretion, error of law, or other serious mistake. *See, e.g., Giant Food, Inc. v. Booker,* 152 Md.App. 166, 182 n. 9, 831 A.2d 481, *cert. denied,* 378 Md. 614, 837 A.2d 926 (2003); *Myers v. Celotex Corp.,* 88 Md.App. 442, 460, 594 A.2d 1248 (1991). Rule 5–702 states:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject and *(3) whether a sufficient factual basis exists to support the expert testimony.*

(Emphasis added); *see also* 6 Lynn McLain, *Maryland Evidence* §§ 702:1–703:1 (2001 & Supp.2004). Appellee's argument focuses solely on the third prong of the rule—whether a sufficient factual basis supported Dr. Klein's opinion that all three children sustained lead-induced injuries throughout their tenancy. Before resolving that issue, however, we must first define, as precisely as possible, what Dr. Klein's opinion was offered to prove.

In order for the first two policies to be "triggered," during those policy periods, the Carpenter children must have suffered "bodily injury," as defined by the policy (and, where necessary, interpreted by the courts). The policies define bodily injury essentially as "bodily harm, sickness or disease," which, in a similar lead paint case, the Court of Appeals has interpreted to mean "harm or damage of, or relating to the body or any localized abnormal condition of the living body." *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.,* 338 Md. 131, 143, 656 A.2d 779 (1995).

In *Chantel*, an expert witness testified to many of the same opinions as Dr. Klein has in the present case, including that "[t]here is probably no safe threshold at which lead has no effect." The expert's opinion was offered in lieu of blood-lead level histories showing exact test results, to prove that the plaintiff-children suffered "bodily injury" for purposes of several potentially triggered insurance policies.

The Court of Appeals held in *Chantel* that the expert's opinion, which was offered in an affidavit, in concert with the plaintiffs' allegations that they had ingested deteriorating lead paint at the premises throughout the policy periods, met their burden of showing bodily injury; and thus triggered the policies. The Court noted that, as in this case, the opposing party had not offered any evidence, by way of affidavit or otherwise, to discredit the expert's opinion that lead ingestion in any amount causes bodily injuries. *Id.* at 144 & n. 8, 656 A.2d 779.[6]

---

**6.** Notably, the *Chantel* Court compared lead paint ingestion to asbestos inhalation, finding them "similar." 338 Md. at 144, 656 A.2d 779. The *Chantel* decision states, *id.*:

> The [lead-paint plaintiffs'] complaint, along with Dr. Schroeder's undisputed affidavit, leads to the conclusion that the "direct and indirect damage to the cells, tissues and organs," caused by the ... plaintiffs' exposure to lead *constitutes* a "bodily injury" as that term was defined in [*Lloyd E.] Mitchell[, Inc. v. Maryland Casualty Co.*, 324 Md. 44, 62, 595 A.2d 469 (1991)]. In fact, the record in the instant case establishes that the "bodily injury" suffered by the ... plaintiffs' exposure to lead is similar to the "bodily injury" suffered in *Mitchell* where we held that " 'bodily injury' occurs when asbestos is inhaled and retained in the lungs." Additionally, according to Dr. Schroeder's uncontradicted affidavit, "bodily injury" occurred immediately or shortly after exposure ... [or] through *in utero* exposure. Thus, the record in the instant case establishes that the ... plaintiffs suffered "bodily injury," immediately or soon after their exposure to the chipping and flaking lead paint at the Chantel property during the Mount Vernon policy period and that this "continuous and repeated exposure" resulted in bodily injury constituting an "occurrence" triggering coverage under the Mount Vernon policy.

> The Court's comparison of lead paint to asbestos is noteworthy because, at oral argument on the summary judgment motion in this case, the trial judge asked a hypothetical question of counsel for appellee: "If the lay witnesses indicate that these children were ingesting lead paint from the beginning of their residence at this property,

■ Consistent with *Chantel,* appellee tacitly concedes that, *if* Dr. Klein's opinion is admissible, then, when combined with the children's lead-level histories and the family's direct observations of lead ingestion, the opinion satisfies appellants' burden of production as to evidence of their injuries during the first and second policy periods. Appellee, however, argues that the opinion is not admissible to prove the point because no published research supports the doctor's opinion.

We dealt with a similar argument in *N.B.S., Inc. v. Harvey,* 121 Md.App. 334, 709 A.2d 162 (1998). In that case, at a trial which occurred sometime after 1995 (i.e., at least four years after the CDC lowered the blood-lead level of concern to $10\mu g/dL$), the medical expert of one of the parties proffered an opinion that lead ingestion only becomes harmful at levels above $40\mu g/dL$. For two reasons the trial court found that the witness was not qualified as an expert, and excluded her testimony: (1) she had not worked as a practitioner or researcher in the field for more than ten years; and (2) as the trial court observed, "there isn't another physician out there who agrees with" her opinion that lead only becomes injurious over $40\mu g/dL$, so under Rule 5–702(3) "there was no existing factual basis" supporting her opinion. *Id.* at 339, 709 A.2d 162. We affirmed that trial court's exercise of discretion in applying Rule 5–702(3).

■ However, the fact that an expert's medical opinion is not generally accepted by the medical community does not stand as an automatic bar to its admissibility under Rule 5–702(3). We so held in *Myers v. Celotex Corp.,* 88 Md.App. at 455–60, 594 A.2d 1248, concluding that the plaintiffs' expert "should have been permitted to state his opinion as to how asbestos fibers cause cancer even though he could not state that the theory he espoused was generally accepted by the

---

doesn't that undermine your argument?" Counsel replied, "No, because ... asbestos is different from lead.... Ingesting or exposure to lead does not result in an injury, cellular changes, until there is a certain level of lead built up into the system." Appellee offered no evidence to support counsel's assertion, or to refute Dr. Klein's opinion to the contrary.

medical community." *Id.* at 455, 594 A.2d 1248. We were careful to add, in that case, that the challenged expert's opinion, while not generally accepted, was also not uniquely held by that expert alone. *Id.* at 459, 594 A.2d 1248; *cf. Giant Food, Inc.,* 152 Md.App. at 188–89, 831 A.2d 481; *Owens Corning v. Bauman,* 125 Md.App. 454, 498–502, 726 A.2d 745 (1999). The challenged opinion simply represented a minority view. We stressed that the standard for admissibility, at bottom, is whether the opinion is offered with a reasonable degree of medical probability. *See also* 5 McLain, *supra,* § 401:4; *cf. id.* § 702:2 at 512–14.

Here, Dr. Klein acknowledged that, as of the time of his depositions, no published research had measured children's lead-induced injuries at levels below 10µg/dL. However, the doctor opined that the Carpenter children sustained lead-induced bodily injuries throughout the tenancy—even without knowing their precise lead levels during the first two policy periods—based upon evidence that lead causes measurable damage at levels above 10µg/dL, and that the Carpenter children were eating lead paint throughout the tenancy.

■ Appellee's attack on Dr. Klein's opinion fails because it assumes a fact not in evidence. Appellee assumes that the record shows that lead ingestion only becomes injurious at levels above 10µg/dL, but appellee offered no evidence supporting the assumption. *See* Md. Rule 2–501(a), quoted *supra; cf. Chantel Assocs.,* 338 Md. at 149–50, 656 A.2d 779. In fact, to the contrary, Dr. Klein testified to his understanding that there is no safe level of lead ingestion. As he pointed out, lead is a "toxin." Dr. Klein is not alone in subscribing to this theory. The expert in *Chantel* testified to essentially the same opinion. 338 Md. at 138–39, 656 A.2d 779.[7] There was adequate factual support for Dr. Klein's opinion to be offered

---

7. The expert in *Chantel* stated, "There are injuries to cells, tissues and organs caused by exposure to lead paint, lead paint chips, lead paint fumes, and/or lead paint dust, even though the injuries may not be noticeable to a harmed individual or diagnosable by a clinician until some later point in time.... There is probably no safe threshold at which lead has no effect."

to a reasonable degree of medical probability, like the opinion offered in *Myers v. Celotex Corp.,* and unlike that offered in *N.B.S., Inc. v. Harvey.*[8] In effect, appellee's theory would write into Rule 5–702(3) a requirement that all medical opinions find support in published research, but neither the rule, nor cases construing it, impose such a requirement. Therefore, we hold that the circuit court erred in concluding that there was no genuine dispute as to whether the Carpenter children were injured during the first and second policy periods.

## II

In light of our resolution of the first issue, the judgment must be vacated and remanded to the trial court.[9] To offer some guidance to the court and the parties on remand, we will address, to some extent, the question appellee has presented in its cross-appeal.

Our consideration of the issue of how any judgment in the tort action should be allocated among the consecutive policies begins with a hypothetical counterfactual, but prefatory to that, we must briefly explain the distinction between triggering of insurance policies versus the allocation of an insured's liability among consecutive policies. The distinction is fairly simple: *if* an insurance policy is triggered, then some amount of the policy's coverage may be applied to indemnify the insured, but allocation (in consecutive, primary policy cases,

---

**8.** It is one thing for a doctor to say, based on the continuously dropping "level of concern" set by the CDC, and professional experience, that no lead level is safe; it is quite another to say, more than seventeen years after the CDC lowered the level of concern from 40μg/dL, and more than four years after it was lowered to 10μg/dL, that injuries only occur above 40μg/dL. The first opinion, while unsupported by published research, is a plausible one, currently espoused by some practitioners and researchers; the latter opinion exceeds the bounds of credulity. Such a reasonableness evaluation is an appropriate consideration for trial judges applying Rule 5–702(3).

**9.** On remand, of course, Dr. Klein will have an opportunity to rely on the Canfield study to support his opinion. With that support, it would be inappropriate to preclude the opinion as being unsupported in fact, under Rule 5–702(3).

such as this) deals with the separate question of how much coverage from each policy applies to indemnify the insured for continuous injuries spanning multiple policy periods.

For our hypothetical, assume, *arguendo,* that the injuries complained of involved only one child, and further, that the injury was the loss of a limb, for which Hooper was held liable. Obviously, despite the continuing, permanent nature of the injury (the limb remains lost during subsequent policy periods), the only policy triggered would be the one in force at the moment of injury; subsequent insurance policies would not be triggered.

The allegations here, however, are that the children suffered a continuous injury throughout consecutive policy periods. In an earlier lead paint case, *Harford Mutual Insurance Co. v. Jacobson,* 73 Md.App. 670, 679–84, 536 A.2d 120 (1988), we held that the test for determining which, if any, policies are triggered in lead paint cases was the "manifestation of injury" standard. In *Jacobson,* we explained:

> We agree with those cases that the date of an "occurrence" for purposes of determining coverage under an insurance policy is the date when the harm is first discovered. In the case *sub judice,* the insurance policy provided coverage only for an occurrence which gave rise to bodily harm *during the period.* [The plaintiff] was first exposed to leaded paint in 1981. Unquestionably, the injurious effects of that exposure persisted into the period of coverage. But, her injuries first manifested themselves *prior* to coverage when she was diagnosed in 1982 by the Baltimore City Health Department as having lead poisoning.

*Id.* at 684, 536 A.2d 120. As we shall explain, that holding has been substantially abrogated by subsequent decisions of the Court of Appeals.

*Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.,* 324 Md. 44, 595 A.2d 469 (1991), was an asbestos injury case. Workers who had been exposed to Mitchell's asbestos products sued the company, and at issue was whether the workers' continuous injuries—from the time of exposure to the manifestation of their injuries—triggered each of the company's consecutive

liability insurance policies. The trial court had concluded, in part relying on *Jacobson*, that the asbestos plaintiffs' injuries only triggered the policies in effect when their injuries manifested, not at the moment of exposure, and not during the development of the attendant illnesses. The Court of Appeals, in an opinion by Chief Judge Robert Murphy, reversed, holding that, "at a minimum, coverage under the policy ... is triggered upon exposure to the insured's asbestos products during the policy period by a person who suffers bodily injury as a result of that exposure." *Id.* at 62, 595 A.2d 469.[10]

A year later, Chief Judge Murphy authored the Court's opinion in *Harford County v. Harford Mutual Insurance Co.*, 327 Md. 418, 610 A.2d 286 (1992), an environmental tort case where pollutants had seeped out of landfills over a long period of time, during numerous consecutive insurance periods. The Court again held, "[M]anifestation is not the sole trigger of coverage in environmental pollution cases." *Id.* at 435–36, 610 A.2d 286. Rather, consistent with the policies' terms, the policies that were triggered were those in effect when injury (or, in that case, property damage) in fact occurred.

In a lead paint case brought in the U.S. District Court for the District of Maryland, Judge J. Frederick Motz concluded, based on his reading of *Mitchell* and *Harford County*, that *Jacobson* was no longer good law, and that in lead paint cases such as this, the appropriate trigger theory is the continuous trigger, not solely manifestation of injury. *Scottsdale Ins. Co. v. Am. Empire Surplus Lines Ins. Co.*, 811 F.Supp. 210, 215 (1993).[11] Judge Motz concluded: "[E]xposure plus bodily

---

**10.** Regarding *Jacobson*, however, the *Mitchell* decision expressly stated, "We express no view as to the correctness of [*Jacobson* ] in the context of the subject matter there involved." 324 Md. at 62 n. 5, 595 A.2d 469; *cf. Chantel Assocs.*, 338 Md. at 144 n. 8, 656 A.2d 779 ("[W]e do not determine whether exposure to chipping and flaking lead paint resulting in bodily injury is the sole trigger of coverage in all lead-related injury cases.").

**11.** *Scottsdale,* more precisely, was not itself the lead paint case; the lead paint case had been settled, and, in *Scottsdale,* insurers were litigating liability for the settlement.

injury (even if unmanifested) is now sufficient under Maryland law to trigger coverage." *Id.*

Finally, in an asbestos property damage case, *Mayor of Baltimore v. Utica Mutual Insurance Co.*, 145 Md.App. 256, 802 A.2d 1070 (2002) (*Utica* ), we held, in an opinion authored by Chief Judge Joseph Murphy, that consecutive policies were triggered by the plaintiff's continuous injury, as long as plaintiffs could prove that damages in fact occurred during the policy periods. *Id.* at 304–06, 802 A.2d 1070. The bulk of the remainder of *Utica* dealt with allocation of liability, which we will analyze presently.

■ In light of those cases subsequent to *Jacobson*, we agree with Judge Motz's conclusion, in *Scottsdale*, that continuous injury, not solely manifestation, is the appropriate trigger in lead paint poisoning cases. *See also* 5 *ATLA's Litigating Tort Cases* § 56–42 (2004) ("[T]he continuous nature of lead poisoning supports an argument for triggering every policy that was in effect during the period of ingestion."); *see also, generally*, Lee H. Ogburn, *The Progression of Trigger Litigation in Maryland—Determining the Appropriate Trigger of Coverage, Its Limitations, and Ramifications*, 53 Md. L.Rev. 220 (1994).

■ Here, appellee argues that even if a continuous injury spanned multiple policy periods, recovery may be had only up to $300,000—in effect, only one policy is triggered—because the above-quoted policy provisions state that USAA's liability for any one occurrence is $300,000.[12] In considering this argument, we apply general interpretive rules applicable to all contracts:

---

12. Appellee relies on the policies' limit of liability:

Our total liability under Coverage E for all damages resulting from any one occurrence will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of insureds, claims made or persons injured. All bodily injury and property damage resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one occurrence.

An insurance policy is construed as an ordinary contract, according to usual, ordinary and accepted meaning [of its terms] unless there is evidence that the parties intended to employ [them] in a special or technical sense. [I]t is the function of the Court to interpret the policy and decide whether or not there is coverage. Maryland does not follow the rule that insurance policies should, as a matter of course, be construed against the insurer. We must observe rules of construction of ordinary contracts, and will review the policy as a whole to ascertain the intentions of the parties.

*Utica,* 145 Md.App. at 301 n. 46, 802 A.2d 1070 (citations and quotation marks omitted).

The circuit court concluded that the policies' limit of liability provisions, while susceptible to the reading given by appellee, are equally susceptible to appellant's interpretation that, while any one policy would pay no more than $300,000 per occurrence, a continuing injury may trigger sequential policies, stacking each of the policies' liability caps. We agree, and again, we begin our analysis with a counterfactual.

In the underlying case, assume, *arguendo,* that the Carpenters win a total judgment of $3 million for injuries sustained during the four insurance periods, and further assume that Hooper had procured the four policies from four different insurers. In such a case, obviously each insurers' per-occurrence liability limits would not apply to limit the availability of coverage from the other policies; Hooper would have $1.2 million dollars of coverage toward his liability to the Carpenters.[13]

---

**13.** As further discussed *infra,* liability in such a case would be apportioned among the four insurers according to either (1) evidence showing what amount of the damages can be attributed to each insurance period, or, if such evidence is unavailable, (2) a pro rata allocation among the policies according to the insurers' "time on the risk." In either case, each policy's liability limits could not be exceeded, even if the liability allocated to a particular policy exceeds that policy's liability limits.

Appellee's interpretation of the per occurrence liability limitation would alter the amount of insurance available, merely on the aleatory circumstance of whether Hooper had changed insurers over the course of the Carpenters' tenancy. Under our hypothetical, Hooper would enjoy the full benefit of the aggregate $1.2 million dollars of coverage he purchased; under appellee's theory, Hooper would only have $300,000 of coverage.

Appellee's interpretation is not compelled by the language of the insurance agreements. When the liability limitation section states, "Our total liability under Coverage E for all damages resulting from any one occurrence will not be more than" $300,000, it can be read to mean "total liability under *this policy*" rather than "total liability under all policies."

Additionally, because appellee's interpretation would substantially alter liability allocation in continuous injury cases, we believe appellee's interpretation is not what was expected by the parties when they made those contracts. *Cf. Scottsdale*, 811 F.Supp. at 216 ("[T]he purpose of the [limitation of liability] clause in question is not to apportion coverage between insurers providing coterminous coverage. Rather, it is to protect the issuing insurer from a claim that each instance of exposure constitutes a separate occurrence for which an independent claim up to the policy limits can be made."); *Utica*, 145 Md.App. at 310–11, 802 A.2d 1070 (indicating compelling force of parties' reasonable expectations in policy interpretation); Robert E. Keeton, *Insurance Law Rights at Variance with Policy Provisions*, 83 Harv. L.Rev. 961 (1970).

■ Appellee's theory runs counter to the pro rata by time-on-the-risk allocation method adopted in continuous injury cases in Maryland. To return to, and extend our hypothetical, if the Carpenters won a $3 million judgment, and if (as is likely the case) the parties cannot establish based on the evidence how to attribute the damages among each of the insurance periods, Maryland law dictates that the judgment be allocated pro rata among the policies based on their time on the risk. *See Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 355

Md. 566, 584–89, 735 A.2d 1081 (1999) (requiring evidence as to impossibility of attributing amounts of liability to particular policy periods); *Harford County,* 327 Md. at 436, 610 A.2d 286 ("The burden to show that property damage occurred within the coverage of the policies is, of course, upon the insured.... [The issue is] quite likely a matter for expert testimony."); *Utica,* 145 Md.App. at 307–314, 802 A.2d 1070 (thoroughly analyzing liability allocation; expressly adopting time-on-the-risk pro rata allocation, rejecting other theories); *see also Scottsdale,* 811 F.Supp. at 216–18 (applying time-on-the-risk allocation in lead paint case). In such cases, liability is pro rated according to each policy's time on the risk because it is only fair (and consistent with policy language) that policies indemnify the insured for those injuries sustained when the policy was in effect, and no others. *See Utica,* 145 Md.App. at 310–14, 802 A.2d 1070.

Applying time-on-the-risk allocation to our hypothetical, assuming four equal one-year policy periods, the $3 million judgment would be allocated as a $750,000 liability against each insurance period. Of course, each policy's limits would bar recovery over $300,000, leaving the insured exposed for the excess $450,000 liability for each insurance period. *See id.* at 314, 802 A.2d 1070 ("[N]o policy would be required to exceed its indemnification limits in any event."). If Hooper were uninsured for any period of time, liability would be allocated to him for that proportion of the judgment—unless he was uninsured because he *could not* obtain insurance—but obviously no liability limit would apply. *Id.* at 313 & n. 54, 802 A.2d 1070 ("[L]osses will be prorated to the insured, unless a gap in coverage is due to the insured's inability to obtain insurance.").

While those results would obtain under settled Maryland law if Hooper had switched insurers for each policy period, appellee's theory would evade those results, and punish insureds for renewing policies with the same insurer. If this issue were ripe for our review, we would reject appellee's theory, as it is inconsistent with Maryland's time-on-the-risk allocation cases, and not mandated by the policies' language.

However, because our resolution of the first issue requires that the case be remanded to the trial court, the parties shall have an opportunity to re-present their arguments to the trial court. They will, at that time, need to establish when the Carpenters moved into the residence; if their first exposure pre-dated appellee's first policy, it may be that Hooper, or whoever insured him at that time, is liable for that portion of the tort judgment attributable to that time period. Additionally, to determine how long the insurer was on the risk, it must be determined (more accurately than "fall of 1993") when the Carpenters' tenancy ended. Finally, to avail themselves of time-on-the-risk allocation, it must be established that a more accurate allocation is not feasible. *See Bausch & Lomb Inc.*, 355 Md. at 586–89, 735 A.2d 1081.[14]

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; THE CASE IS REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS.**

**COSTS TO BE PAID BY APPELLEE.**

---

14. This issue becomes particularly relevant in light of the Canfield study's suggestion that lead ingestion up to $10\mu g/dL$ is disproportionately injurious.